## GLASSER *v.* UNITED STATES.*

No. 30. Argued November 13, 14, 1941.—Decided January 19, 1942.

---

[5] See Note 3, *ante.*

* Together with No. 31, *Kretske* v. *United States,* and No. 32, *Roth* v. *United States,* also on writs of certiorari, 313 U. S. 551, to the Circuit Court of Appeals for the Seventh Circuit.

*Messrs. Homer Cummings* and *Ralph M. Snyder* argued the cause, and *Mr. William D. Donnelly* was on the brief with *Mr. Cummings,* for petitioner in No. 30. *Mr. Edward M. Keating,* with whom *Mr. Joseph R. Roach* was on the brief, submitted for petitioner in No. 31. *Mr. Alfred E. Roth* submitted, *pro se,* in No. 32.

*Mr. Edwin D. Dickinson,* with whom *Assistant Solicitor General Fahy, Assistant Attorney General Berge,* and *Mr. Richard S. Salant* were on the brief, for the United States.

*Messrs. Ralph M. Snyder* and *John Elliott Byrne* filed a brief, as *amici curiae,* on behalf of petitioner in No. 30, urging reversal.

MR. JUSTICE MURPHY delivered the opinion of the Court.

Petitioners, together with Anthony Horton and Louis Kaplan, were found guilty upon an indictment charging them with a conspiracy to defraud the United States, under § 37 of the Criminal Code (R. S. § 5440; 18 U. S. C. § 88).[1] Judgment was entered on the verdict and Glasser, Kretske and Kaplan were sentenced to imprisonment for a term of 14 months. Roth was ordered to pay a fine of $500, and Horton was placed on probation. On appeal the convictions of Glasser, Kretske and Roth were affirmed.[2] We brought the case here because of the important constitutional issues involved. 313 U. S. 551.

Glasser was the assistant United States attorney in charge of liquor cases in the Northern District of Illinois from about March 1935 to April 1939. Kretske was an assistant United States attorney in the same district from October 1934 until April 1937. He assisted Glasser in the prosecution of liquor cases. After his resignation he entered private practice in Chicago. Roth was an attorney in private practice. Kaplan was an automobile dealer reputed to be engaged in the illicit alcohol traffic around Chicago. Horton was a professional bondsman.

The indictment was originally in two counts, but only the second survives here, as the Government elected to

---

[1] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

[2] 116 F. 2d 690.

proceed on that count alone at the close of its case. That count, after alleging that during certain periods Glasser and Kretske were assistant United States attorneys for the Northern District of Illinois, employed to prosecute all delinquents for crimes and offenses cognizable under the authority of the United States, and more particularly violations of the federal internal revenue laws relating to liquor, charged in substance that the defendants conspired to "defraud the United States of and concerning its governmental function to be honestly, faithfully and dutifully represented in the courts of the United States" in such matters "free from corruption, improper influence, dishonesty, or fraud." The means by which the conspiracy was to be accomplished was alleged to be by the defendants' soliciting certain persons charged, or about to be charged, with violating the laws of the United States, to promise or cause to be promised certain sums to be paid or pledged to the defendants, to be used to corrupt and influence the defendants Glasser and Kretske, and the defendant Glasser alone, in the performance of their and his official duties.

All the defendants filed a motion to quash the indictment on the ground (a) that the grand jury was illegally constituted because women were excluded therefrom and (b) that the indictment was not properly returned in open court. Glasser, Kretske and Roth also filed demurrers to the indictment. The motion to quash and the demurrers were overruled, and petitioners here renew their objections.

On July 1, 1939, two Acts of the State of Illinois providing for women jurors became effective.[3] Section 275 of the Judicial Code (28 U. S. C. § 411) provides in substance that jurors in a federal court are to have the qualifications of jurors in the highest court of the State. Petitioners

---

[3] Ill. Rev. Stat., 1939, c. 78, §§ 1 and 25.

contend that the grand jury, composed entirely of men, and summoned on August 25, 1939, was illegally constituted because, at the time it was drawn, Illinois law required state jury lists to contain the names of women. However, in 17 of the 18 counties comprising the Northern District of Illinois the county boards could wait until September, 1939, to include women on their jury lists.[4] Of course, for women to serve as federal jurors in Illinois it is not necessary that their names appear on a county list, but we are of opinion that, in view of the short time elapsing between the effective date of the Illinois Acts and the summoning of the grand jury, it was not error to omit the names of women from federal jury lists, where it was not shown that women's names had yet appeared on the state jury lists.

The record here adequately disposes of petitioners' contention that there is no showing that the indictment was returned in open court by the grand jury. It contains a placitum in regular form which recites the convening of a regular term of the District Court for the Eastern Division of the Northern District of Illinois, "on the first Monday of September [1939] (it being the twenty-ninth day of September the indictment was filed)," and discloses the presence of the judges of that court, the marshal and the clerk. The indictment bears the notation: "A true bill, George A. Hancock, Foreman", and the endorsement: "Filed in open court this 29th day of Sept.,

---

[4] Section 1 of Chapter 78 of the Illinois Revised Statutes, 1939, applies to counties not having jury commissioners (into which class the 17 counties fall) and provides:

"The county board of each county shall, at or before the time of its meeting, in September, in each year, or at any time thereafter, when necessary for the purpose of this Act, make a list of sufficient number, not less than one-tenth of the legal voters of each sex of each town or precinct of the county, giving the place of residence of each name on the list, to be known as a jury list."

A. D. 1939, Hoyt King, Clerk." Immediately following the indictment in the record is the motion-slip discharging the September grand jury, dated September 29, 1939, initialled by Judge Wilkerson and containing: "The Grand Jury return 4 Indictments in open Court. Added 10/30/39." The presence of this notation in the record is meaningless unless the indictment in this case is one of the four mentioned. The addition was obviously made to clarify the indorsement of the clerk so as to show clearly the return by the grand jury and thus avert the technical argument here advanced. While a formal *nunc pro tunc* order would have been the more correct procedure, especially since a new term of court had begun, we do not think that this informal clarification of the record amounts to such error as requires reversal. Cf. *Breese* v. *United States,* 226 U. S. 1.

The demurrers to the indictment were properly overruled. The indictment is sufficiently definite to inform petitioners of the charges against them. It shows "certainty, to a common intent." *Williamson* v. *United States,* 207 U. S. 425, 447. The particularity of time, place, circumstances, causes, etc., in stating the manner and means of effecting the object of a conspiracy, for which petitioners contend, is not essential to an indictment. *Crawford* v. *United States,* 212 U. S. 183; *Dealy* v. *United States,* 152 U. S. 539. Such specificity of detail falls rather within the scope of a bill of particulars, which petitioners requested and received.

The indictment charges that the United States was defrauded by depriving it of its lawful governmental functions by dishonest means; it is settled that this is a "defrauding" within the meaning of § 37 of the Criminal Code. *Hammerschmidt* v. *United States,* 265 U. S. 182.

It is unnecessary to explore the merits of the argument that the indictment is defective on the ground that it

charges a conspiracy to commit a substantive offense requiring concerted action, namely, bribery, because, "The indictment does not charge as a substantive offense the giving or receiving of bribes; nor does it charge a conspiracy to give or accept bribes. It charges a conspiracy to . . . defraud the United States, the scheme of resorting to bribery being averred only to be a way of consummating the conspiracy and which, like the use of a gun to effect a conspiracy to murder, is purely ancillary to the substantive offense." *United States* v. *Manton,* 107 F. 2d 834, 839.

Petitioners Glasser and Roth claim that the evidence was insufficient to support the verdict. Kretske makes no such argument but merely contends that the Government's testimony was largely that of accomplices "to emphasize the inescapable conclusion that the evidence against petitioner (Kretske) was of a borderline character." Since we are of opinion that a new trial must be ordered as to Glasser, we do not at this time feel that it is proper to comment on the sufficiency of the evidence against Glasser.

Admittedly, the case against Glasser is not a strong one. The Government frankly concedes that the case with respect to Glasser "depends in large part . . . upon a development and collocation of circumstances tending to sustain the inferences necessary to support the verdict." This is significant in relation to Glasser's contention that he was deprived of the assistance of counsel contrary to the Sixth Amendment. In all cases the constitutional safeguards are to be jealously preserved for the benefit of the accused, but especially is this true where the scales of justice may be delicately poised between guilt and innocence. Then error, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial, since there is a real chance that it might have provided the slight impetus which swung the scales toward guilt.

On November 1, 1939, George Callaghan entered the appearance of himself and Glasser as attorneys for Glasser. On January 29, 1940, William Scott Stewart entered his appearance as associate counsel for Glasser. "Harrington & McDonnell" had entered an appearance for Kretske. On February 5, 1940, the day set for trial, Harrington asked for a continuance. The motion was overruled and McDonnell was appointed Kretske's attorney. On February 6, McDonnell informed the court that Kretske did not wish to be represented by him. The court then asked if Stewart could act as Kretske's attorney. The following discussion then took place:

"Mr. Stewart: May I make this statement about that, judge? We were talking about it—we were all trying to get along together. I filed an affidavit, or I did on the behalf of Mr. Glasser pointing out some little inconsistency in the defense, and the main part of it is this: There will be conversations here where Mr. Glasser wasn't present, where people have seen Mr. Kretske and they have talked about, that they gave money to take care of Glasser, that is not binding on Mr. Glasser, and there is a divergency there, and Mr. Glasser feels that if I would represent Mr. Kretske the jury would get an idea that they are together, and all the evidence—

"The Court: How would it be if I appointed you as attorney for Kretske?

"Mr. Stewart: That would be for your Honor to decide.

"The Court: I know you are looking out for every possible legitimate defense there is. Now, if the jury understood that while you were retained by Mr. Glasser the Court appointed you at this late hour to represent Kretske, what would be the effect of the jury on that?

"Mr. Stewart: Your Honor could judge that as well as I could.

"The Court: I think it would be favorable to the defendant Kretske.

"Mr. Glasser: I think it would be too, if he had Mr. Stewart. That's the reason I got Mr. Stewart, but if a defendant who has a lawyer representing him is allowed to enter an objection, I would like to enter my objection. I would like to have my own lawyer representing me.

"The Court: Mr. McDonnell, you will have to stay in it until Mr. Kretske gets another lawyer, if he isn't satisfied with you.

"(To Mr. Kretske) Mr. Kretske, if you are not satisfied with Mr. McDonnell, you will have to hire another lawyer. We will proceed with the selection of the jury now."

A colloquy then ensued between the court, McDonnell and Kretske when the following occurred:

"Mr. Kretske: I can end this. I just spoke to Mr. Stewart and he said if your Honor wishes to appoint him I think we can accept the appointment.

"Mr. Stewart: As long as the Court knows the situation. I think there is something to the fact that the jury knows we can't control that.

"Mr. McDonnell: Then the order is vacated?

"The Court: The order appointing Mr. McDonnell is vacated and Mr. Stewart is appointed attorney for Mr. Kretske."

Glasser remained silent. Stewart thereafter represented Glasser and Kretske throughout the trial and was the most active of the array of defense counsel.

The guarantees of the Bill of Rights are the protecting bulwarks against the reach of arbitrary power. Among those guarantees is the right granted by the Sixth Amendment to an accused in a criminal proceeding in a federal court "to have the assistance of counsel for his defense." "This is one of the safeguards deemed necessary to insure fundamental human rights of life and liberty," and a

federal court cannot constitutionally deprive an accused, whose life or liberty is at stake, of the assistance of counsel. *Johnson* v. *Zerbst,* 304 U. S. 458, 462, 463. Even as we have held that the right to the assistance of counsel is so fundamental that the denial by a state court of a reasonable time to allow the selection of counsel of one's own choosing, and the failure of that court to make an effective appointment of counsel, may so offend our concept of the basic requirements of a fair hearing as to amount to a denial of due process of law contrary to the Fourteenth Amendment, *Powell* v. *Alabama,* 287 U. S. 45, so are we clear that the "assistance of counsel" guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired.

To preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights. *Aetna Insurance Co.* v. *Kennedy,* 301 U. S. 389; *Ohio Bell Telephone Co.* v. *Public Utilities Commission,* 301 U. S. 292. Glasser never affirmatively waived the objection which he initially advanced when the trial court suggested the appointment of Stewart. We are told that, since Glasser was an experienced attorney, he tacitly acquiesced in Stewart's appointment because he failed to renew vigorously his objection at the instant the appointment was made. The fact that Glasser is an attorney is, of course, immaterial to a consideration of his right to the protection of the Sixth Amendment. His professional experience may be a factor in determining whether he actually waived his right to the assistance of counsel. *Johnson* v. *Zerbst,* 304 U. S. 458, 464. But it is by no means conclusive.

Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. Speaking of the obligation of the trial court to preserve the right to jury trial for an accused, Mr. Justice Sutherland said that such duty "is not to be discharged as a matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity." *Patton* v. *United States,* 281 U. S. 276, 312–313. The trial court should protect the right of an accused to have the assistance of counsel. "This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." *Johnson* v. *Zerbst,* 304 U. S. 458, 465.

No such concern on the part of the trial court for the basic rights of Glasser is disclosed by the record before us. The possibility of the inconsistent interests of Glasser and Kretske was brought home to the court, but instead of jealously guarding Glasser's rights, the court may fairly be said to be responsible for creating a situation which resulted in the impairment of those rights. For the manner in which the parties accepted the appointment indicates that they thought they were acceding to the wishes of the court. Kretske said the appointment could be accepted "if your Honor wishes to appoint him [Stewart]," and Stewart immediately replied: "As long as the Court knows the situation. I think there is something in the fact that the jury knows we can't control that." The court made no effort to reascertain Glasser's attitude or

wishes. Under these circumstances, to hold that Glasser freely, albeit tacitly, acquiesced in the appointment of Stewart is to do violence to reality and to condone a dangerous laxity on the part of the trial court in the discharge of its duty to preserve the fundamental rights of an accused.

Glasser urges that the court's appointment of Stewart as counsel for Kretske embarrassed and inhibited Stewart's conduct of his defense, in that it prevented Stewart from adequately safeguarding Glasser's right to have incompetent evidence excluded and from fully cross-examining the witnesses for the prosecution.

One Brantman, an accountant known to Kretske and recommended professionally by him to a client, testified that he gave Kretske $3000 on behalf of one Abosketes. He further testified that he did not know Glasser. Stewart secured a postponement of cross-examination for "In view of the fact that your Honor appointed me for Mr. Kretske, I am not prepared to cross-examine."

Abosketes took the stand immediately after Brantman and testified that Brantman told him that he was about to be indicted and offered to "fix" the case with someone in the Federal Building for $5000. About the time of this meeting, Glasser and investigator Bailey were questioning one Brown, who had been convicted for operating a still, to determine whether Abosketes was connected with that still. Abosketes referred frequently to Glasser in his testimony and indicated that Glasser and Brantman were linked together. Thus he testified that Brantman told him "They have got the goods on you, Mr. Glasser has got it out of Brown." When questioned as to his knowledge of Brantman's connections, Abosketes replied: "There was more than a fix, if indictment was stopped. He [Brantman] knows Mr. Glasser and that was all there was to it." And, later: "He had connections to stop things like that, he had connections in the Federal Build-

ing." And, again: "I could not be sure that this man [Brantman] was not putting a shake on me and be honest about it. I could not go over and ask Mr. Glasser if Mr. Brantman was able to fix him. I thought Brantman could, though. I was kind of hoping he could. If I did not think he could, I would not have given him the money."

Brantman was re-called three days later. Stewart declined cross-examination. That this decision was influenced by a desire to protect Kretske can reasonably be inferred from the colloquy between the court and Stewart before sentence was imposed. At that time Stewart told the court that, lest his failure to cross-examine Brantman reflect on Kretske, the reason for his forbearance was that he feared that Brantman would tell worse lies. But, especially after the intervening testimony of Abosketes, a thorough cross-examination was indicated in Glasser's interest to fully develop Brantman's lack of reference to, or knowledge of Glasser. Stewart's failure to undertake such a cross-examination luminates the cross-purposes under which he was laboring.

Glasser also argues that certain testimony, inadmissible as to him, was allowed without objection by Stewart on his behalf because of Stewart's desire to avoid prejudice to Kretske. The testimony complained of is that of Elmer Swanson, Frank Hodorowicz, Edward Dewes, and Stanley Wasielewski as to statements made by Kretske, not in the presence of Glasser, and heard by them which implicated Glasser. Glasser has red hair, and the statements made by Kretske were that he would have to see "Red," or send the money over to the "red-head," etc., in connection with "fixing" cases.[5]

Glasser contends that such statements constituted inadmissible hearsay as to him and that Stewart forewent

[5] Elmer Swanson testified that when money was paid to Kretske in connection with the Stony Island still case Kretske said that part

this obvious objection lest an objection on behalf of Glasser alone leave with the jury the impression that the testimony was true as to Kretske. The Government attacks this argument as unsound, and, relying on the doctrine that the declarations of one conspirator in furtherance of the objects of the conspiracy made to a third party are admissible against his co-conspirators, *Logan* v. *United States,* 144 U. S. 263, contends that the declarations of Kretske were admissible against Glasser and hence no prejudice could arise from Stewart's failure to object. However, such declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof *aliunde* that he is connected with the conspiracy. *Minner* v. *United States,* 57 F. 2d 506; and see *Nudd* v. *Burrows,* 91 U. S. 426.

---

of it would go to "Red or Dan." The witness understood this to refer to Glasser.

Frank Hodorowicz testified that he gave $800 in currency to Kretske to secure favorable action with regard to a still at 124 East 118th Place. Kretske told Frank he "had to deliver the money to Red." Hodorowicz knew this meant Glasser. Frank attempted to "fix" a case for Albina Zarrattini through Kretske, who declined after "he talked to Red" because Zarrattini talked too much.

After Frank Hodorowicz was himself indicted he went to Kretske to "fix" his case. Kretske told him there was "a lot of heat" on the case and "They got Glasser over a barrel, he can't do anything. He has to put you in jail."

When Edward Dewes gave Kretske $100 so that he would not be indicted in connection with a still at Spring Grove, Kretske told him "he would send it over to the red-head in the Federal Building." The witness knew this meant Glasser. Dewes also testified that Kretske told him that he, Kretske, had resigned from the United States attorney's office under pressure, and that, "for holding the bag," he was to receive favors from the "red-head."

Stanley Wasielewski testified that he heard Kretske tell Stanley Slesur that "I will take care of everything between me and the red-head." Both Wasielewski and Slesur were involved in a still at Downers Grove.

Otherwise, hearsay would lift itself by its own bootstraps to the level of competent evidence.

Glasser urges that, independently of the statements complained of, there is no proof connecting him with the conspiracy. Clearly the statements were damaging. Other evidence tending to connect Glasser with the conspiracy is rather meagre by comparison. Frank Hodorowicz testified that Glasser apologized to him after his indictment because he, Glasser, could do nothing for Hodorowicz. Hodorowicz also testified that he sent a case of whiskey to Glasser for Christmas, 1937. Victor Raubunas testified that he saw Glasser, Kretske and Kaplan meet on three occasions. An alcohol agent, Dowd, testified that Glasser expelled him from the court-room during the trial of a libel case in which Roth represented the successful claimant. Glasser released Raubunas and one Joppek, who were picked up on different occasions for suspected liquor violations, without extensive questioning. Whether testimony such as this was sufficient to establish the participation of Glasser in the conspiracy we need not decide. That is beside the point. The important fact is that no objection was offered by Stewart on Glasser's behalf to the statements complained of, and this despite the fact that, when the court broached the possibility of Stewart's appointment, Stewart told the court that statements of this nature were not binding on Glasser. That this is indicative of Stewart's struggle to serve two masters cannot seriously be doubted.

There is yet another consideration. Glasser wished the benefit of the undivided assistance of counsel of his own choice. We think that such a desire on the part of an accused should be respected. Irrespective of any conflict of interest, the additional burden of representing another party may conceivably impair counsel's effectiveness.

To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of

Stewart as counsel for Kretske is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. Cf. *Snyder* v. *Massachusetts,* 291 U. S. 97, 116; *Tumey* v. *Ohio,* 273 U. S. 510, 535; *Patton* v. *United States,* 281 U. S. 276, 292. And see *McCandless* v. *United States,* 298 U. S. 342, 347. Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting, that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court. In conspiracy cases, where the liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant, it is especially important that he be given the benefit of the undivided assistance of his counsel without the court's becoming a party to encumbering that assistance. Here the court was advised of the possibility that conflicting interests might arise which would diminish Stewart's usefulness to Glasser. Nevertheless Stewart was appointed as Kretske's counsel. Our examination of the record leads to the conclusion that Stewart's representation of Glasser was not as effective as it might have been if the appointment had not been made. We hold that the court thereby denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amendment. This error requires that the verdict be set aside and a new trial ordered as to Glasser.

But this error does not require that the convictions of the other petitioners be set aside. To secure a new trial they must show that the denial of Glasser's constitutional rights prejudiced them in some manner, for where error

as to one defendant in a conspiracy case requires that a new trial be granted him, the rights of his co-defendants to a new trial depend upon whether that error prejudiced them. *Agnello* v. *United States,* 269 U. S. 20; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150; *Rossi* v. *United States,* 278 F. 349; *Belfi* v. *United States,* 259 F. 822; *Browne* v. *United States,* 145 F. 1; *Dufour* v. *United States,* 37 App. D. C. 497. Kretske does not contend that he was prejudiced by the appointment, and we are clear from the record that no prejudice is disclosed as to him. Roth argues the point, but he was represented throughout the case by his own attorney. We fail to see that the denial of Glasser's right to have the assistance of counsel affected Roth.

Turning now to the contentions of Kretske and Roth, we are clear that substantial evidence supports the verdict against both. As noted before, Kretske does not raise the point other than to mention that the testimony against him was largely that of accomplices and unsavory characters. The short answer to this is that the credibility of a witness is a question for the jury.

The evidence against Roth discloses the following salient facts. Elmer Swanson, Clem Dowiat and Anthony Hodorowicz were arrested in connection with a still on Stony Island Avenue. Frank Hodorowicz, the head of the Hodorowicz crowd, arranged a meeting with Kretske at his hardware store to "take care" of the case. Horton was present and Kretske told the group that there "was a lot of heat" on the case but that it could be arranged so that nobody "would go to jail" for $1200, part of which "Red" was to get. A down payment of $500 was made. When a lawyer was sought, Kretske referred the prospective defendants to Roth. He represented them at the hearing before the Commissioner, which was continued at the request of Glasser. After an indictment was returned, Roth appeared for trial to find that the case had

been stricken from the docket with leave to reinstate it. The defendants were never brought to trial. None of the Hodorowiczes or their associates paid Roth for his services. Roth testified that he received his fee from Kretske.

In June 1938, Glasser secured two indictments, one against Frank, Mike, and Peter Hodorowicz and Clem Dowiat, and the other against Frank and Peter Hodorowicz and Dowiat, for the sale of illicit alcohol. Frank paid Kretske $250 after the indictments. Kretske later told him that nothing could be done, as investigator Bailey was pressing Glasser. Frank then went to see Roth, who with Kretske went to see Glasser. Roth later told Frank that nothing could be done and suggested that he get an attorney and prepare to defend himself. Roth's explanation of this was that he went to Glasser to learn the latter's attitude toward clemency for Frank, and that he suggested the retention of two lawyers, one to defend Frank, and the other to represent the remaining defendants. Frank dispensed with Roth's services and was represented at the trial by one Hess. Frank paid Roth $50, but this was in connection with substituting some securities on his bond.

Edward Dewes had been associated with the defendant Kaplan in a still at Spring Grove. That case was twice presented to a grand jury by Glasser but withdrawn on each occasion. Two days before it was presented a third time, the defendant Horton told Dewes that Kretske wished to see him. Dewes went to Kretske's office and paid him $100 so that he would not be indicted. Dewes was no-billed in that case. Dewes was also involved in a still on the farm of one Beisner. It was raided and several were arrested. Dewes, Victor Raubunas and Edward Farber asked Horton to "fix" that case, but when his price was thought too high, Farber, who had known Kretske for some time, took Dewes and Raubunas to Kretske's

office. Kretske offered to take care of the case for $1200. Raubunas paid $300 and they were told they would need no lawyer at the preliminary hearing. Eventually Raubunas, Dewes and Beisner were indicted. Dewes thereafter paid Kretske $275 to "fix" his case. Kretske referred the matter to Roth, who represented Dewes throughout his trial. Dewes testified that he neither retained nor paid Roth.

Paul Svec, an associate of one Yarrio, was arrested in 1937 for a liquor violation. Horton arranged his bond. In Svec's presence Horton picked up Kretske and Yarrio. They told Svec not to worry. He was thereafter indicted and convicted. While at liberty pending an appeal, he was again arrested. This time he called Glasser, and according to the latter, offered him money. The following morning Glasser interrogated Svec in the hearing of a secreted agent of the Federal Bureau of Investigation and secured admissions that Svec had never paid Glasser money or received any promises from him, and that the call had been at the instigation of the arresting investigators. Svec testified that Roth told him that he "stood up o. k." under Glasser's questioning. Svec was discharged at the Commissioner's hearing.

Glasser prosecuted Leo Vitale for the operation of a still. He was convicted and received a sentence of one hour in the custody of the marshal. Vitale's wife, Rose, was the claimant in a subsequent libel action against a car allegedly used to transport illicit liquor. The case was referred to Roth by Kretske. Roth informed the court that Vitale was "o. k." and that the car was not used for illegal purposes. As was the custom, the case was tried on the agent's report. It was dismissed. Investigator Dowd later informed Glasser that he had heard that Vitale had boasted that "he got out of this for nine hundred dollars."

In April 1938, Edward and William Wroblewski were indicted in the Northern District of Indiana. They en-

gaged Roth as their counsel. They did not remember how they met Roth. When asked by the court if anyone recommended Roth to him, Edward answered: "No, sir, I don't remember whether it was a rumor about his name." According to Alexander Campbell, an assistant United States attorney in that district, Roth appeared in his office in September 1938 and asked if the Wroblewskis had been indicted. Campbell replied that he did not know off-hand but would check the files. Roth then asked, if the files showed no indictment, whether some arrangement could be made so that no indictment would be returned. He offered Campbell $500 or $1000. When Campbell refused, Roth said: "Well, that is the way we handle cases in Chicago sometimes." The Wroblewskis were convicted. Subsequently, Roth asked Campbell to use his influence to stop the investigation in Chicago by Bailey which resulted in the instant case.

It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. *United States* v. *Manton,* 107 F. 2d 834, 839, and cases cited. Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a "development and a collocation of circumstances." *United States* v. *Manton, supra.* We are clear that, from the circumstances outlined above, the jury could infer the existence of a conspiracy and the participation of Roth in it. Roth's statements to Campbell in the Wroblewski matter, his suggestion to Frank Hodorowicz that he should get a lawyer and prepare to defend himself when the case could not be "fixed," the fact that he received no fees from the Hodorowiczes with the exception of $50 in connection with Frank's bond, Dewes' testimony that he neither retained nor paid Roth, Roth's commendation of Svec's bearing under Glasser's

interrogation, all furnish the necessary support for the jury's verdict.

The objections of Kretske and Roth with regard to the admission of certain evidence are without merit. The reports of investigators of the Alcohol Tax Unit on stills at Western Avenue and at Spring Grove, operated by the defendant Kaplan and his associates, were admitted as Government exhibits 81A and 113. Each contained statements taken from prospective witnesses by the investigators, and each gave a description of the prospective defendants. Kaplan was referred to as of Jewish descent, a bootlegger by reputation, and mention was made of the arrest of Kaplan and Edward Dewes in connection with the killing of one Pinna. At the time each report was admitted the trial judge informed the jury that it was admitted only against Glasser and continued: "At some further stage of the proceedings I may advise you with reference to its competency as to the other defendants, but for the time being it will be admissible only against the defendant Glasser." The record before us contains no indication that the jury was later informed that the exhibits were evidence against the defendants other than Glasser. The claim of Kretske and Roth, that the admission of these reports was prejudicial to Kaplan and that they are entitled to take advantage of that error, ignores the fact that they were admitted against Glasser alone.

No reversible error was committed by overruling objections to the testimony of Alexander Campbell with relation to his dealings with Roth. Trial judges have a measure of discretion in allowing testimony which discloses the purpose, knowledge, or design of a particular person. *Butler* v. *United States*, 53 F. 2d 800; *Simpkins* v. *United States*, 78 F. 2d 594, 598. We do not think the bounds of that discretion were exceeded here. The statements of Roth were not in furtherance of the conspiracy, but they

did tend to connect Roth with it by explaining his state of mind.

The judge conducting a jury trial in a federal court is "not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct." *Quercia* v. *United States,* 289 U. S. 466, 469. Upon him rests the responsibility of striving for that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. Petitioners contend that the trial judge made remarks prejudicial to them, committed acts of advocacy, questioned them in a hostile manner, unduly limited cross-examination, and in general failed to maintain an impartial attitude. Various incidents in support of those contentions are brought to our attention.

The court did interrogate several witnesses, but in the main such interrogation was within its power to elicit the truth by an examination of the witnesses. *United States* v. *Gross,* 103 F. 2d 11; *United States* v. *Breen,* 96 F. 2d 782. In asking Anthony Hodorowicz whether there had been a full disclosure of his connection with the Stony Island still when he appeared before Judge Woodward, the court obviously was under a misapprehension of the nature of the appearance. It was simply for the purpose of arraignment, and of course no testimony was offered. Much is made of this, but at the time no one attempted to explain to the court the nature of the appearance. Stewart later brought out on cross-examination that it was only an arraignment and that there was no necessity for testimony on that day.

After the testimony of Abosketes, the court read into the record the fact that Abosketes was indicted in Wisconsin in 1936 and 1938, and that he pleaded guilty to one indictment and that the other was dismissed. It is, of course, improper for a judge to assume the role of a witness, but we cannot here conclude that prejudicial error

resulted. Abosketes had briefly referred to his troubles in Wisconsin in his testimony.

The alleged undue limitation of cross-examination merits scant attention. The extent of such examination rests in the sound discretion of the trial court. *Alford* v. *United States,* 282 U. S. 687. We find no abuse of that discretion.

Perhaps the court did not attain at all times that thoroughgoing impartiality which is the ideal, but our examination of the record as a whole leads to the conclusion that the substantial rights of the petitioners were not affected. The trial was long and the incidents relied on by petitioners few. We must guard against the magnification on appeal of instances which were of little importance in their setting. Cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 240; *Goldstein* v. *United States,* 63 F. 2d 609; *United States* v. *Warren,* 120 F. 2d 211.

Separate consideration of the numerous instances of alleged prejudicial misconduct on the part of the prosecuting attorney would unduly extend this opinion. Suffice it to say, that after due consideration we conclude that no one instance, nor the combination of them all, constitutes reversible error.

All the petitioners contend that they were denied an impartial trial because of the alleged exclusion from the petit jury panel of all women not members of the Illinois League of Women Voters. In support of their motions for a new trial, Glasser and Roth filed affidavits which are the basis of petitioners' present contentions. Kretske did not file an affidavit, but he urges the point here.

Glasser swore on information and belief that all the names of women placed in the box from which the panel was drawn were taken from a list furnished the clerk of the court by the Illinois League of Women Voters, and pre-

pared exclusively from its membership, that the women on that list had attended "jury classes whose lecturers presented the views of the prosecution," and that women not members of the League, but otherwise qualified, were systematically excluded, by reason of which affiant "did not have a trial by a jury free from bias, prejudice, and prior instructions, and as a result thereof the jury was disqualified and this affiant's rights were prejudiced in that he was deprived of a trial by jury guaranteed to him by the laws and the constitution of the United States of America, and particularly the 5th and 6th amendment, all of which he offers to prove." The source of Glasser's information was stated to be a then current article, "Women and the Law," in the American Bar Association Journal for April 1940 (Vol. 26, No. 4). Roth's affidavit merely gave Glasser as his source of information and made no offer of proof. The court overruled the motions for a new trial. The record discloses that the jury was composed of six men and six women.

Since it was first recognized in Magna Carta, trial by jury has been a prized shield against oppression, but, while proclaiming trial by jury as "the glory of the English law," Blackstone was careful to note that it was but a "privilege." *Commentaries*, Book 3, p. 379. Our Constitution transforms that privilege into a right in criminal proceedings in a federal court. This was recognized by Justice Story: "When our more immediate ancestors removed to America, they brought this great privilege [trial by jury in criminal cases] with them, as their birthright and inheritance, as a part of that admirable common law which had fenced round and interposed barriers on every side against the approaches of arbitrary power. It is now incorporated into all our State constitutions as a fundamental right, and the Constitution of the United States would have been justly obnoxious to the most conclusive

objection if it had not recognized and confirmed it on the most solemn terms." 2 Story, Const. § 1779.

Lest the right of trial by jury be nullified by the improper constitution of juries, the notion of what a proper jury is has become inextricably intertwined with the idea of jury trial. When the original Constitution provided only that "The trial of all crimes, except in cases of impeachment, shall be by jury," [6] the people and their representatives, leaving nothing to chance, were quick to implement that guarantee by the adoption of the Sixth Amendment which provides that the jury must be impartial.

For the mechanics of trial by jury we revert to the common law as it existed in this country and in England when the Constitution was adopted. *Patton* v. *United States,* 281 U. S. 276. But even as jury trial, which was a privilege at common law, has become a right with us, so also, whatever limitations were inherent in the historical common law concept of the jury as a body of one's peers do not prevail in this country. Our notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government. For "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *Smith* v. *Texas,* 311 U. S. 128, 130.

Jurors in a federal court are to have the qualifications of those in the highest court of the State, and they are to be selected by the clerk of the court and a jury commissioner. §§ 275, 276 Jud. Code; 28 U. S. C. §§ 411, 412. This duty of selection may not be delegated. *United States* v. *Murphy,* 224 F. 554; *In re Petition For Special Grand Jury,* 50 F. 2d 973. And, its exercise must always

[6] Const., Art. III, § 2, cl. 3.

accord with the fact that the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a "body truly representative of the community," and not the organ of any special group or class. If that requirement is observed, the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may, one by one, lead to the irretrievable impairment of substantial liberties.

The deliberate selection of jurors from the membership of particular private organizations definitely does not conform to the traditional requirements of jury trial. No matter how high-principled and imbued with a desire to inculcate public virtue such organizations may be, the dangers inherent in such a method of selection are the more real when the members of those organizations, from training or otherwise, acquire a bias in favor of the prosecution. The jury selected from the membership of such an organization is then not only the organ of a special class, but, in addition, it is also openly partisan. If such practices are to be countenanced, the hard-won right of trial by jury becomes a thing of doubtful value, lacking one of the essential characteristics that have made it a cherished feature of our institutions.

So, if the picture in this case actually is as alleged in Glasser's affidavit, we would be compelled to set aside the trial court's denial of the motion for a new trial as a clear abuse of discretion, and order a new trial for all the petitioners. But from the record before us we must conclude that petitioners' showing is insufficient. The Government did not controvert the affidavits by counter-affidavits or formal denial, and it does not appear from the record that any argument was heard on them. From this, petitioners argue that the allegations of the affidavits are to be taken as true for the purpose of the motion. However, this is not a case where the prosecution has impliedly, *Neal* v. *Delaware,* 103 U. S. 370, or actually, *Hale* v. *Kentucky,* 303 U. S. 613, stipulated that affidavits in support of a motion alleging the improper constitution of a jury may be accepted as proof. In the absence of such a stipulation, it is incumbent on the moving party to introduce, or to offer, distinct evidence in support of the motion; the formal affidavit alone, even though uncontroverted, is not enough. *Smith* v. *Mississippi,* 162 U. S. 592; *Tarrance* v. *Florida,* 188 U. S. 519; cf. *Brownfield* v. *South Carolina,* 189 U. S. 426. Glasser, in his affidavit, offered to prove the allegations contained therein, but the record is barren of any actual tender of proof on his part. Furthermore, there is no indication that the court refused to entertain such an offer, if it were in fact made. Roth did not even make an offer of proof in his affidavit, and Kretske did not file one. While it is error to refuse to hear evidence offered in support of allegations that a jury was improperly constituted, *Carter* v. *Texas,* 177 U. S. 442, there is, and, on the state of this record, can be, no assertion that such error was here committed. The failure of petitioners to prove their contention is fatal.

We conclude that the conviction of Glasser must be set aside and the cause as to him remanded to the District

Court for the Eastern Division of the Northern District of Illinois for a new trial. The convictions of petitioners Kretske and Roth are in all respects upheld.

*No. 30, reversed.*
*Nos. 31 and 32, affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE FRANKFURTER:

The CHIEF JUSTICE and I are of opinion that the conviction of Glasser, as well as that of his co-defendants, should stand.

It is a commonplace in the administration of criminal justice that the actualities of a long trial are too often given a meretricious appearance on appeal; the perspective of the living trial is lost in the search for error in a dead record. To set aside the conviction of Glasser (a lawyer who served as an Assistant United States Attorney for more than four years) after a trial lasting longer than a month, on the ground that he was denied the basic constitutional right "to have the assistance of counsel for his defence," is to give fresh point to this regrettably familiar phenomenon. For Glasser himself made no such claim at any of the critical occasions throughout the proceedings. Neither when the judge appointed Stewart to act as counsel for both Kretske and Glasser, nor at any time during the long trial, nor in his motions to set aside the verdict and to arrest judgment, nor in his plea to the court before sentence was passed, nor in setting forth his grounds for appeal, did Glasser assert, or manifest in any way a belief, that he was denied the effective assistance of counsel. Not until twenty weeks after Stewart had become counsel for the co-defendant Kretske, and fifteen weeks after the trial had ended, did Glasser discover that he had been

deprived of his constitutional rights. This was obviously a lawyer's afterthought. It does not promote respect for the Bill of Rights to turn such an afterthought into an imaginary injury that is reflected nowhere in the contemporaneous record of the trial, and make it the basis for reversal.

The guarantees of the Bill of Rights are not abstractions. Whether their safeguards of liberty and dignity have been infringed in a particular case depends upon the particular circumstances. The fact that Glasser is an attorney, of course, does not mean that he is not entitled to the protection which is afforded all persons by the Sixth Amendment. But the fact that he is an attorney with special experience in criminal cases, and not a helpless illiterate, may be—as we believe it to be here—extremely relevant in determining whether he was denied such protection.

In this light, what does the record show? Before the trial got under way the trial judge was presented with a problem created by the inability of one of Kretske's lawyers to try the case in his behalf. Kretske was dissatisfied with his other lawyer, who professed to be unfamiliar with the many details of the case. Upon Kretske's motion for a continuance, the judge was faced with the difficulty of avoiding either delay of the trial or an undesirable severance as to Kretske. All the defendants, including Glasser, and their counsel were present in court. The judge asked whether Stewart, who had been retained by Glasser, would be prepared to act also for Kretske. The record gives no possible ground for any inference other than that this suggestion came from the judge as a fair and disinterested proposal to solve a not unfamiliar trial problem. It is not, and indeed could not be, contended that the judge's suggestion, addressed to the consideration of the defendants, was not wholly proper. And so,

when Stewart raised the question of a possible conflict of interest, and Glasser himself objected, saying "I would like to have my own lawyer representing me," the judge neither remonstrated nor argued. He promptly dropped his suggestion and directed Kretske's other lawyer, who was present but with whom Kretske was dissatisfied, to stay in the case until Kretske could hire someone to his satisfaction. The footnote sets forth the full text of this episode.[1]

There ensued a long discussion relating to the representation of Kretske. During this discussion the judge never

[1] "Mr. Stewart: May I make this statement about that, judge? We were talking about it—we were all trying to get along together. I filed an affidavit, or I did on the behalf of Mr. Glasser, pointing out some little inconsistency in the defense, and the main part of it is this: There will be conversations here where Mr. Glasser wasn't present, where people have seen Mr. Kretske and they have talked about, that they gave money to take care of Glasser, that is not binding on Mr. Glasser, and there is a divergency there, and Mr. Glasser feels that if I would represent Mr. Kretske the jury would get an idea that they are together, and all the evidence—

The Court: How would it be if I appointed you as attorney for Mr. Kretske?

Mr. Stewart: That would be for your Honor to decide.

The Court: I know you are looking out for every possible legitimate defense there is. Now, if the jury understood that while you were retained by Mr. Glasser the Court appointed you at this late hour to represent Kretske, what would be the effect of the jury on that?

Mr. Stewart: Your Honor could judge that as well as I could.

The Court: I think it would be favorable to the defendant Kretske.

Mr. Glasser: I think it would be too, if he had Mr. Stewart. That's the reason I got Mr. Stewart, but if a defendant who has a lawyer representing him is allowed to enter an objection, I would like to enter my objection. I would like to have my own lawyer representing me.

The Court: Mr. McDonnell, you will have to stay in it until Mr. Kretske gets another lawyer, if he isn't satisfied with you. (To Mr. Kretske) Mr. Kretske, if you are not satisfied with Mr. McDonnell, you will have to hire another lawyer. We will proceed with the selection of the jury now."

again adverted to his original suggestion that Stewart also represent Kretske. Kretske interrupted, and there then occurred in Glasser's presence what is now made the basis for reversal:

"Mr. Kretske: I can end this. I just spoke to Mr. Stewart and he said if your Honor wishes to appoint him I think we can accept the appointment.

"Mr. Stewart: As long as the Court knows the situation. I think there is something to the fact that the jury knows we can't control that.

"Mr. McDonnell: Then the order is vacated?

"The Court: The order appointing Mr. McDonnell is vacated and Mr. Stewart is appointed attorney for Mr. Kretske."

It is clear, therefore, that this arrangement was voluntarily assumed by the parties, and was not pressed upon them by the judge. Glasser, who was present, raised no objection and made no comment.

The requirement that timely objections be made to prejudicial rulings of a trial judge often has the semblance of traps for the unwary and uninformed. But Glasser was neither unwary nor uninformed. His experience in the prosecution of criminal cases makes his silence here most significant. Nor was this the last opportunity he had to indicate that embarrassment was being caused him by Stewart's representation of Kretske, let alone that he deemed it a denial of his constitutional rights. If he were laboring under a handicap, he would have made it known at the times when he felt it most—during the long course of the trial, in his motions for new trial and in arrest of judgment, in his extended plea to the court before sentence was passed, and finally when, on April 26, 1940, over his own signature he gave twenty grounds for appeal but did not mention this one. The long period of uninterrupted silence concerning his after-discovered injury negatives its existence. We find it difficult to know what acquies-

cence in a judge's ruling could be, if this record does not show it.[2]

A fair reading of the record thus precludes the inference that the judge forced upon Glasser a situation which hobbled him in his defense. To be sure, he did say at first that he would like his lawyer to represent him alone. But he plainly acquiesced in the arrangement which, after consultation at the defense table, was proposed to the trial judge and which the judge accepted. A conspiracy trial presents complicated questions of strategy for the defense. There are advantages and disadvantages in having separate counsel for each defendant or a single counsel for more than one. Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack. These considerations could not have escaped a lawyer of Glasser's experience. His thorough acquiescence in the proceedings cannot be reconciled with a denial of his constitutional rights.

A belated showing that Glasser was actually prejudiced by the judge's action is now attempted. This has two aspects: (1) Stewart's failure to cross-examine the witness Brantman, and (2) his failure to make objections on behalf of Glasser to the admission of certain evidence.

---

[2] Stewart was designated to represent Kretske on February 6, 1940, when the trial began. The jury brought in its verdict on March 8. The motions for new trial and in arrest of judgment were denied on April 23, and on the same day the defendants were sentenced. On April 26, Glasser filed a notice setting forth twenty grounds of appeal without suggesting that he had been denied his right to the assistance of counsel. On June 27, Glasser and the two other petitioners filed a "joint and several assignment of errors," for the first time asserting that: "The court erred in appointing the employed counsel of defendant Daniel D. Glasser to represent defendant Norton I. Kretske, to the prejudice of the defendants."

(1) The Brantman episode evaporates upon examination. His only testimony relating to Glasser was that he did not know him. This was brought out fully and distinctly on direct examination.[3] That it had been amply established, Glasser himself recognized in his address to the court before sentence. It is difficult to understand how cross-examination would have been of any further benefit to Glasser. In any event, the record shows that Stewart abstained from cross-examining Brantman not because he felt himself inhibited by any conflict of interest but because, as he told the judge after verdict, he thought that on cross-examination Brantman "would be telling worse lies."

(2) It is said that Stewart's failure to object, on behalf of Glasser, to certain evidence in itself proves that Stewart felt himself restricted—wholly regardless of the admissibility of such evidence. No evidence inadmissible against Glasser is avouched. Indeed we are told that it is "beside the point" that the evidence is admissible. Can it be that a lawyer who fails to make frivolous objections to admissible evidence is thereby denying his client the constitutional right to the assistance of counsel?

---

[3] "Q. Do you know Mr. Glasser?

A. No, sir.

Q. Did you ever see him before the time you got this money?

A. I have seen him, I think I might have been introduced to the man once, but I don't think it was before I got that money.

Q. You never had any conversation with him in any event?

A. No, sir.

Q. What?

A. No, sir."