**UNITED STATES of America**
**v.**
**John RILEY, Robert Jusseaume, et al.**
**No. 7718.**

United States District Court,
D. Rhode Island.

Oct. 18, 1971.

**832**

Lincoln C. Almond, U. S. Atty., and S. Michael Levin, Sp. Atty., U. S. Department of Justice, Providence, R. I., for plaintiff.

John D. Lynch, Warwick, R. I., for Riley.

Dominic A. St. Angelo, Providence, R. I., for Jusseaume.

## MEMORANDUM AND ORDER

PETTINE, Chief Judge.

The defendants' motions for a new trial pursuant to Federal Rule Crim.P. 33 are premised on the contention that they were denied such effective representation by counsel as to amount to a deprivation of Sixth Amendment Constitutional rights.

These defendants together with four others, namely Dennis Raimondi, Thaddeus Bigos, Nicholas Pari and Joseph DiCarlo, were tried jointly and convicted for theft and/or conspiracy to steal from an interstate shipment 18 U.S.C. §§ 659, 371. During the trial all were represented by private counsel—Raimondi by Alfred A. Farese, Esq., Bigos by Anthony DeCecca, Esq., DiCarlo and Pari by John Cicilline, Esq. and both the moving defendants by Robert H. O'Brien, Esq. Following the return of the verdict on July 12, 1971 and before sentence, bail was revoked. The reasons for bail revocation and subsequent affirmation by the court of appeals, not being pertinent to this motion, need not be discussed.

On August 2, 1971, defendants Riley and Jusseaume executed affidavits and appeared before the Court requesting that they be incarcerated in a jail other than the one holding defendant Raimondi because they feared for their lives, having been threatened by Raimondi on a number of occasions.

The Riley affidavit states in part, "After I was indicted, I, along with my co-defendant Robert Jusseaume, retained an attorney, Andrew Bucci to represent me in this case. After Bucci told me he was going to file a motion to sever on my behalf, Raimondi ordered me and my co-defendant Robert Jusseaume in a threatening manner to fire Bucci. We fired Bucci and took as our present attorney Robert O'Brien who was introduced to me on the first day of my trial by Al Farese, Raimondi's lawyer." The Jusseaume affidavit has substantially the same language. They further requested that the Court appoint counsel for them as indigent defendants as they no longer wanted to be represented by O'Brien.

Separate attorneys were appointed by me and they filed and argued motions for a new trial presenting evidence which established that following the return of the indictments on January 27, 1971, defendants Riley and Jusseaume employed the services of Andrew Bucci, a lawyer practicing in Rhode Island, who entered his appearance only on behalf of Riley. Though the testimony is that he was retained by both and paid a two hundred dollar retainer by Jusseaume, no explanation was given for this single entry. Mr. Bucci advised his clients that he intended to file a motion to sever Riley and Jusseaume's trial from that of Raimondi and the other defendants. Riley claims Raimondi, on hearing this, disagreed with such tactics and directed them by way of a threat to discharge Bucci and go to the office of Farese, where an attorney would be provided for them. Fearing Raimondi, they did this and there they were met by Mr. Farese's son, also a lawyer, who talked with them for approximately fifteen minutes. There is a dispute as to whether or not Mr. O'Brien was present at this meeting. O'Brien claims he was, though the defendants state otherwise.

There is no question that O'Brien did not engage in any of the conversation.

Between this time and the trial date many pre-trial motions were disposed of by the Court, all of which had been presented on behalf of the other four defendants. Conceding none had been presented for Jusseaume and Riley, Mr. O'Brien states this was so because he did not represent them at the time of the filing.

The defendants Riley and Jusseaume further assert that they did not see O'Brien until 20 minutes before the commencement of the trial—which is somewhat confirmed by the records in the case showing his appearance as of that date. Furthermore, it is not denied.

Mr. O'Brien stated to this Court that he is an attorney practicing in Massachusetts and an associate of Mr. Farese, who pays him a set salary. Prior to meeting the two defendants in question he had prepared all the motions filed on behalf of Raimondi together with the legal memoranda; he was not paid any moneys over and above his salary for representing Riley and Jusseaume since he did this at the direction of Mr. Farese as his employer. All trial expenses for Riley and Jusseaume were paid by Farese, and O'Brien did not discuss the case with his clients before trial. He does contend, however, he conducted an independent defense based on trial strategy he thought was in the best interests of his clients; and that he did confer with them privately during the course of the trial. On the other hand, the defendants deny this stating, " * * * that during the trial days and intervening Saturdays and Sundays * * * (they) were never allowed to speak with their attorney Robert O'Brien without the presence of Dennis Raimondi or Dennis Raimondi's attorney, Al Farese * * * that (Riley) did not trust Raimondi's attorney, Mr. Farese, and was afraid to discuss certain matters in confidence with Mr. O'Brien while in the presence of Mr. Farese * * * that he had no trust

and confidence in Attorney O'Brien and that on at least two occasions during his trial he asked for permission of O'Brien and Farese to have Mr. Bucci reenter the case on behalf of himself and defendant Jusseaume * * *" that this was turned down by Farese and Raimondi. (Defendant's Brief on Motion for New Trial.) This recitation substantially comports with Riley's testimony. O'Brien, however, contends he told his clients he was ready to withdraw if they were dissatisfied but was told by them not to do so.

From these facts this Court can easily make the following findings based on the unrefuted testimony and portions of the record, together with reasonable inferences therefrom:

1) Following the indictment Jusseaume and Riley did in fact engage Attorney Bucci to represent them and that

2) Subsequently Jusseaume and Riley discharged Mr. Bucci on pain of retaliation by Raimondi if they failed to do so; and under the coercive force of fear they went to Mr. Farese's office as directed.

3) Until the date of trial they were not counseled, advised, or in any way received the direct services of attorney O'Brien, who

4) Did not in fact see them until 20 minutes before commencement of trial.

5) Mr. O'Brien is and was throughout this period a paid employee of Alfred Farese, Esq. for whom he prepared all pre-trial motions and legal memoranda on behalf of defendant Raimondi.

6) Mr. Farese paid all trial expenses of whatever nature incurred on behalf of Jusseaume and Riley.

7) Accepting Riley and Jusseaume's testimony as establishing finding numbered 2, supra, the inescapable inference is that this was a calculated move to assure a defense harmonious with that of Raimondi however inimical to that of Riley and Jusseaume.

To these findings of fact this Court, as the Presiding Judge at the trial, notes that Mr. O'Brien ostensibly conducted an adequate defense. He cross-examined witnesses and presented independent "alibi" testimony. In its outward appearance his advocacy neither appreciably rose nor fell below the performance level of the other defense counsel.

On these facts the defense contends deprivation of effective assistance of counsel of constitutional proportions while the prosecution argues waiver.

"The court may grant a new trial to a defendant if required in the interest of justice. * * *" Fed.R.Crim. Proc. 33.

■ This is declaratory of the court's power founded in the raison d'etre of its own existence—" * * * the interest of justice." Limitation of this power is addressed to the sound discretion of the court and a finding must stand inviolably absent abuse of discretion.

The right to a fair trial through the effective assistance of counsel evolved from Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) through Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), to Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). This is a long and scholarly history with travels to varying cognate areas on the same theme. I believe we are brought today to another one of these areas.

We are not discussing the effective assistance of an unfettered appointed counsel whose trial strategies, techniques, or ability may be questioned. This is an area of many shadings that I do not feel are relevant to the issue at hand. Rather this Court has before it the coercive acceptance of a lawyer whose parameters of human conduct cannot be viewed as reaching any plateau of required independence. Can it be said in the light of the established facts that no conflict of interests existed, no tacit economic pressures insidiously pervaded the defense? Indeed,

can any argument be proffered to justify the inference in finding no. 7—so abhorrent to even a modicum of fair play. To condone such execrable conduct is to place an imprimatur on a procedure criminally controlled to the desecration of substance—justice and fair play.

■ I am constrained to say the answers to the questions must be in the negative and extrapolate such conclusion with the further question—Were these defendants denied the right to counsel of their own choosing whose services they could afford? This I answer in the affirmative. "Since the right to counsel is a matter of substance not form, it is the solemn duty of the trial judge to make sure that representation is not an empty gesture, but is the fulfillment of the spirit and purpose of the constitutional mandate." Willis v. Hunter, 166 F.2d 721 (10th Cir. 1948), quoted in Gadsden v. United States, 96 U.S.App.D.C. 162, 223 F.2d 627 (1955).

It is aphoristic that if these two defendants had been denied by the court the right to retain counsel of their own selection whose services were readily available and offered due process of law would have been violated.

"If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

"A necessary corollary is that a defendant must be given a reasonable opportunity to employ and consult with counsel; otherwise, the right to be heard by counsel would be of little worth." (Citations omitted) Chandler v. Fretag, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954).

■ This case teaches us that the right to retain counsel is absolute and if a state cannot deprive a defendant of this fundamental constitutional imperative, I find no difficulty in analogizing

it to the situation at hand of denial by fear from a private source. The essence and meaning of *Chandler* is the right to one's own available counsel. To say this is satisfied by forcing other counsel on an accused would be a sardonic conclusion to a cherished right and it matters not whether the culprit be the state or a third party private individual, the end result is the same.

The willingness of courts to protect the right of the accused to counsel of his own choosing is illustrated by Lee v. United States, 98 U.S.App.D.C. 272, 235 F.2d 219 (1956), which held that the trial court abused its discretion by assigning as counsel an attorney to whom the accused objected. In reversing and remanding for a new trial, Judge Bazelon stated, "It is a fundamental principle that an accused be permitted to choose his own counsel." Id. at 221. There the attorney in question had earlier in the same case been retained by the accused but had been given permission to withdraw when defendant objected to him. This attorney was appointed by the court when the accused's chosen attorney withdrew from the case on the day of trial.

Nor do I feel the position I take is nullified by the reality that coerced counsel conducted a defense. The argument that it apparently was satisfactory is sheer sophistry for the conflict of interest as existed in this case carries its own inherent prejudicial evil, albeit, the trial counsel's efforts were conscientious.[1]

It has been said that although the accused may be represented by counsel of his own choice, "[effective] representation is lacking * * * if counsel, unknown to the accused and without his knowledgeable assent, is in a duplicitous position where his full talents * * * are hobbled or fettered or restrained by commitments to others." Porter v. United States, 298 F.2d 461, 463 (5th Cir. 1962) No knowledgeable assent or even free choice of counsel can be predicated from the facts before me. It may well be that an inherent conflict of interest precluded O'Brien from making the motion to sever. See Randazzo v. United States, 339 F.2d 79 (5th Cir. 1964). That there was an inherent conflict of interest for counsel is evident. Prior to his serving as counsel for Riley and Jusseaume, Mr. O'Brien prepared pre-trial motions and memorandum for defendant Raimondi. Mr. O'Brien was not directly retained by Riley and Jusseaume. Rather he was assigned to defend them and paid by Mr. Farese, his employer and Mr. Raimondi's attorney. After the trial Mr. O'Brien was asked by Mr. Farese to visit Mr. Raimondi in prison for him. To gain entrance to the prison, Mr. O'Brien filled out a card, stating that he was Raimondi's attorney.

The difficulty of pinpointing in the record specific instances where petitioners' rights were prejudiced by this conflict of interest recommends to me the wisdom of the approach taken by the Supreme Court of Illinois in People v. Stoval, 40 Ill.2d 109, 239 N.E.2d 441 (1968):

"The circumstances here are such that an attorney cannot properly serve two masters. * * * [H]is [defendant's] right to counsel under the Constitution is more than a formality, and to allow him to be represented by an attorney with such conflicting interests as existed here without his knowledgeable consent is little better than allowing him no lawyer at all. See Gideon v. Wainright [Wainwright] (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799. This situation is too fraught with the dangers of prejudice, prejudice which the cold record

---

1. See Beaney, The Right to Counsel in American Courts, 163:
    Rights are agreed upon in order to insure that justice will be done prospectively, in the ordinary run of affairs.

To hold that an individual can be deprived of rights except in those cases where a retrospective view of events reveals a shocking situation is to defeat the whole rationale of the rule of law.

might not indicate, that the mere existence of the conflict is sufficient to constitute a violation of relator's rights whether or not it in fact influences the attorney or the outcome of the case.

"There is no showing that the attorney did not conduct the defense of the accused with diligence and resoluteness, but we believe that sound policy disfavors the representation of an accused, especially when counsel is appointed, by an attorney with possible conflict of interests. It is unfair to the accused, for who can determine whether his representation was affected, at least, subliminally, by the conflict. Too, it places an additional burden on counsel, however conscientious, and exposes him unnecessarily to later charges that his representation was not completely faithful. In a case involving such a conflict there is no necessity for the defendant to show actual prejudice. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Goodson v. Peyton (4th Cir.), 351 F.2d 905." 40 Ill.2d at 112, 113, 239 N.E.2d at 443. Cited with approval in Zurita v. United States, 410 F.2d 477 (7th Cir. 1969).

Petitioners also contend that there is a conflict of interest in O'Brien representing both Riley and Jusseaume.

I find consideration of language from Avery v. Alabama, 308 U.S. 444, 60 S. Ct. 321, 84 L.Ed. 377 (1940) to be instructive:

"But the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement than an accused be given the assistance of counsel." 308 U.S. at 446, 60 S.Ct. at 322.

It is no less mere form of compliance with the Constitutional requirement when defendants' fear of a co-defendant so paralyzes them that they do not confer with counsel selected by, presumably paid for by this menacing co-defendant. Petitioners did not meet with O'Brien until shortly before the trial and maintain that they never discussed trial strategy alone with him. While belated appearance of counsel does not automatically require reversal of conviction, Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the circumstances of this case argue strongly that petitioners did not participate in their defense because they were inhibited by fear of Raimondi, thus making a mockery of the notion of assistance by independent counsel. Furthermore, I am not unmindful of a position that may be urged by the government that the interrelation of the cases made the defense of one the defense of all. At best this is tenuous. It is false, indeed, to equate one man's mind with that of another and say the cerebrations of counsel were necessarily limited by the nature of the charge.

## WAIVER

Here the defendants were told they would not be represented by counsel of their choice—they were told another lawyer would be provided for them.

■■ Petitioners' going to trial with the "provided" attorney and remaining silent until after the finding of guilt is a modestly troublesome aspect of this case. It may be argued that just as they called this to the attention of the court post-verdict they could have done so pre-trial, ergo there was an "intentional relinquishment of known right" Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, and therefore what they did was voluntary. I must indulge every reasonable presumption against the waiver of the unimpaired assistance of counsel. Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Conceding arguendo the defendants intentionally relinquished a known right it does not end there. An involuntary relinquishment of the right to select available counsel of one's own

choosing, standing alone, violates a basic concept of a fair trial. Chandler v. Fretag, *supra*. The ingredient of voluntariness is the sine qua non for satisfaction of constitutional waiver. Cf. Leavitt v. Howard, 332 F.Supp. 845, D.R.I., 1971.

The ambiance of coercion negated this essential. Faced with no alternative but possible incarceration their revelation to the Court is understandable.

The defendants' motions for a new trial is hereby granted.[2]

---

2. The cases involving sixth amendment rights are legion, replete with decisional law pertinent to the facts at issue. Apart from the court's reasoning any one may well be considered dispositive of the issue presented, viz.:

*Insufficient time to prepare a defense*—Stamps v. United States, 8 Cir., 387 F.2d 993; Gadsden v. United States, 96 U.S.App.D.C. 162, 223 F.2d 627, at 632 " * * * it is the solemn duty of the trial judge to make sure that representation is not an empty gesture, but is the fulfillment of the spirit and purpose of the constitutional mandate" citing Willis v. Hunter, 10 Cir., 166 F.2d 721.

*Conflict of interest in dual representation*—United States v. Sheiner, 2 Cir., 410 F.2d 337, " * * * while serious problems are avoided by having representation by separate counsel in criminal cases involving more than one defendant, defendants who retain counsel also have a right of constitutional dimensions to be represented by counsel of their own choice and this right should not be unnecessarily obstructed by the court."

Where there is a conflict of interest a conviction cannot stand. Craig v. United States, 6 Cir., 217 F.2d 355.

See also Campbell v. United States, 122 U.S.App.D.C. 143, 352 F.2d 359 and United States v. Hammonds, 138 U.S. App.D.C. 766, 425 F.2d 597.