John A. SHUTTLE

v.

**Robert G. SMITH, Warden, Vermont State Prison.**

**Civ. A. No. 5395.**

United States District Court
D. Vermont.

March 3, 1969.

William H. Quinn, Burlington, Vt., for petitioner.

Alan W. Cheever, Esq., Asst. Atty. Gen., Montpelier, Vt., and Joseph C. Palmisano, State's Atty., Washington County, Barre, Vt., for respondent.

## OPINION

LEDDY, District Judge.

Petitioner, John A. Shuttle, filed with this Court an application for writ of habeas corpus against Robert G. Smith, Warden of the Vermont State Prison. He alleges that he was denied the effective assistance of counsel in connection with his prosecution by the State of Vermont on four charges of breaking and entering. The petitioner pleaded guilty and was sentenced to serve not less than five nor more than seven years

on each charge, the sentences to run concurrently.

An order to show cause was duly issued and a return made by the respondent. This Court appointed William H. Quinn, Esq. to represent the petitioner and a hearing was held at which oral and documentary evidence was received and certain stipulations of fact were filed.

From the evidence and stipulations, I find the following facts:

1. At sometime during the evening of April 17 or the early morning hours of April 18, 1963, petitioner was taken into custody by the Vermont State Police in connection with an investigation of numerous breaks into dwelling houses in the Northfield, Vermont, area and was lodged in the Washington County Jail.

2. On April 18, 1963, an information was filed in Montpelier Municipal Court by States Attorney John A. Bernasconi charging that the petitioner on February 15, 1963, broke and entered in the nighttime a dwelling house owned by Ralph Goodel in Roxbury with intent therein to commit a felony. On the same day, similar informations were filed against Albert Premont, Ricardo Diego and Vernon Truman, also known as John Truman. Also on the same day, informations were filed charging that Glen Corey and Donald Shuttle on March 30, 1963, broke and entered in the nighttime a dwelling house owned by John Doe with intent therein to commit a felony.

3. During the day of April 18, 1963, petitioner contacted the office of Attorney Richard Davis of Barre who had represented petitioner in another criminal proceeding. Mr. Davis was unavailable but at some time during that evening, Mr. Davis and one of his associates, Stephen B. Martin, Esq., visited petitioner and his brother, Donald, at the Washington County Jail. As a result of that meeting, Attorney Martin appeared on April 19, 1963, with petitioner and his brother, Donald, in Montpelier Municipal Court before Judge John Connarn for arraignment on the single charge then pending against each of them. At the same time, Premont, Truman, Corey and Diego also appeared for arraignment on the charges pending against them.

4. At the arraignment proceedings, Martin spoke with the petitioner, his brother, Donald Shuttle, Premont and Truman and all were in general agreement that he should appear for each of them. Corey was represented by Martin at arraignment but subsequently obtained other counsel. Diego at all times had other counsel. All respondents entered not guilty pleas at the arraignment session on April 19, 1963.

5. On April 19, 1963, following the arraignment, additional charges were brought in the Montpelier Municipal Court against the petitioner, Premont, Corey, Truman and Diego alleging other offenses of similar nature. On April 22, 1963, the petitioner, Premont and Truman appeared with Attorney Martin in Montpelier Municipal Court for arraignment on the additional charges brought against them. Attorney Martin entered not guilty pleas to each of the new charges for each of his clients. On April 24, 1963, Judge Connarn of the Washington Municipal Court assigned Attorney Martin to represent Shuttle because of the latter's lack of property or funds to engage counsel.

6. On April 22, 1963, Premont pleaded guilty to the first charge brought against him. On April 24, 1963, Diego pleaded guilty to all charges pending against him. On April 26, 1963, Premont pleaded guilty to the two additional charges pending against him. Donald Shuttle pleaded guilty to the single charge pending against him and Corey pleaded guilty to the two charges pending against him. Martin later learned that Diego, Premont and Corey had given statements to the State Police prior to Martin's talk with the defendants represented by him, tending to incriminate the petitioner.

7. On May 3, 1963, informations were filed in the Washington County Court

charging the petitioner and Truman with the same crimes for which they were charged in Montpelier Municipal Court. Upon the filing of these informations in the Washington County Court, both Shuttle and Truman then decided to enter pleas of guilty in the Municipal Court rather than in County Court. Both returned to the Municipal Court on the following day to change their pleas from not guilty to guilty. However, Truman refused to change his plea and elected to stand trial by jury in the Washington County Court on the information filed in that Court on May 3, 1963. Shuttle pleaded guilty to all four charges pending against him in the Municipal Court. Sentence was deferred until after the Truman trial.

8. On May 8, 1963, following his guilty plea, petitioner gave a written signed statement to the Vermont State Police. The statement was given with the consent of Martin as he thought that it would be in the petitioner's best interest to cooperate with the State Police in an effort to solve other breaks in the community. However, the statement is restricted to events of February 15, 1963, with respect to the Goodel and Gale breaks with which the petitioner was already charged and to which he had already pleaded guilty.

9. The Truman trial began on May 15, 1963. When Truman refused to change his plea as agreed, Mr. Martin then felt that a conflict of interest had arisen by reason of his representation of both the petitioner and Truman. He advised the Washington County Court of the situation and moved to be relieved of his assignment to defend Truman on the grounds of this conflict of interest. His motion was denied. Again, at the opening of the Truman trial in the Washington County Court, Martin moved to withdraw as counsel for Truman on the same ground and again his motion was denied. At this time, he represented to the County Court in part as follows:

I wish further to point out that these pleas of guilty have been entered in Montpelier Municipal Court at least a week and a half ago and they have not yet been sentenced. Further, that the State's Attorney has conferred with two of these people, who were my clients, namely, Albert Premont and John Shuttle, in reference to testifying in this case. My permission has not been sought to interview these people, nor has the State's attorney informed me what took place at these conferences, and the impression is created that if they testify favorably to the state that the logical inference to be drawn is that there is a promise of a lesser sentence or promise of a recommendation of a lesser sentence in the Municipal Court; and that if they should testify favorably to the respondent, there is the implication that I as their counsel have sought to put words into their mouths and have asked them to testify on behalf of the respondent, which places me, I believe, in a serious conflict of interest situation. Therefore I renew my motion to withdraw and to give this respondent sufficient time to seek other counsel.

10. At Truman's trial in the Washington County Court, the State called Shuttle as a witness. This placed Martin in the position of fulfilling his obligation to his client Truman by cross-examining his client Shuttle. Shuttle's testimony generally supported Truman's defense theory. It was Martin's opinion that the testimony given by Shuttle would not be helpful to him in regard to his own sentence and so advised him.

11. Some of Martin's cross-examination is as follows:

Q. Mr. Shuttle, would you tell us in your own words how you happened to go to this particular place, the Goodell and Gale residence, that night in question? A. Yah, I was down in the bowling alley; I was and Albert Premont, and John came in. We were all drinking pretty good.

Q. Please speak up a little louder. A. Well, we were down there drinking in the bowling alley; there was nothing to do, nobody there; Richard Diego

came down about nine o'clock, somewhere around there, and he called me aside and he kind of mentioned it would be a good night to do something.

Q. What did he mean, "good night to do something"? A. Well, break into a camp or something, I guess is what he meant.

Q. Had you done this with Mr. Diego on previous occasions? A. Yes.

Q. Could you state roughly how many? A. Ten or fifteen probably.

Q. Were they recent, I mean recent in terms of February 6, 1963? A. Yes, yes.

Q. Were there any other people with you at the time of these breaks? A. No, not always.

Q. You were always with Mr. Diego? A. Yah.

(Exhibit 3 pp. 14-15)

Q. As I understand it, you and Ricky had done this on previous occasions? A. Yes, several times.

(Exhibit 3 p. 17)

Q. Have you been involved in breaks with Mr. Diego since this time? A. Yes.

Q. And have you entered pleas of guilty to some of these charges in Montpelier Municipal Court? A. Yes.

(Exhibit 3 p. 23)

Q. Now, had John Truman ever been with you on any of these previous occasions? A. No.

Q. Was he aware of them? A. I don't think so.

(Exhibit 3 p. 16)

Q. Mr. Shuttle, when you and Ricky decided—As I understood, you had a conversation at the bowling alley? A. Yes.

Q. Was Mr. Truman in on that conversation? A. No.

Q. Are you sure of that? A. Yah.

(Exhibit 3 p. 17)

Note—This testimony is in direct conflict with the statement given by petitioner to the State Police on May 8, 1963.

Q. And when Vernon [Truman] realized you were going to break into the house, he didn't want anything to do with it? A. No.

Q. Are you sure of that? A. Yes.

Q. And what did he say? A. Well, What I remember of it, he wanted to try to get us to leave then. He wanted to go back down to Harry's where we were going and wanted to get some beer there and drink there.

(Exhibit 3 p. 19)

This testimony is likewise inconsistent with petitioner's written statement of May 8, 1963, which, fairly construed, would indicate that Truman was the lookout.

12. The same prosecuting officer appeared against all defendants in Montpelier Municipal Court and in Washington County Court.

13. Martin handled the cases against all of his clients on a group basis rather than individually and did not, in so many words, inform Shuttle of a possible conflict of interest between his rights and the rights of the others.

14. Shuttle, who had only a fourth grade education, had never heard of the term "conflict of interest," was not aware of the possibility of such conflict nor was he aware that the Court could appoint someone else to represent him or the others separately.

15. At the time that Judge Connarn appointed Martin to represent the petitioner, he did not advise him of the possibility of a conflict of interest between petitioner and his corespondents and did not offer to appoint separate counsel for him.

16. On May 24, 1963, petitioner was sentenced in Montpelier Municipal Court to serve not less than five and not more than seven years in the Vermont State Prison at Windsor on each of the four charges against him, the sentences to be served concurrently; Premont was sentenced to prison for 4-6 years on all counts, concurrent; Corey was sentenced to 3-5 years, concurrent; Donald Shut-

tle was sentenced to 2–3 years; and Diego was sentenced to 4–6 years, concurrent. Petitioner is presently imprisoned in the Vermont State Prison serving the sentences imposed by the Montpelier Municipal Court on May 8, 1963.

17. On April 19, 1965, petitioner filed with the Vermont Supreme Court a Petition for Writ of Habeas Corpus, which was amended on May 5, 1965. A hearing was held and Findings of Fact were made on July 28, 1965, which were accepted by the Vermont Supreme Court. The petition, as amended, was denied on October 5, 1965. In re Shuttle, 125 Vt. 257, 214 A.2d 48 (1965).

In its opinion, the Vermont Supreme Court disposed of the petitioner's claim on the ground that his plea of guilty waived his right to contend that there was a conflict of interest between himself and Truman. Thus, petitioner has exhausted his State remedy on this question.

However, from the facts found at the evidentiary hearing in this Court, it clearly appears that the petitioner, at no time during the proceedings, knew or was advised of his rights to separate counsel, had never heard of the term "conflict of interest" and did not know that such a conflict could impair his constitutional rights. From the outset, when Attorney Martin represented several respondents, including the petitioner, there was a possible conflict of interest which may have been minimal until petitioner changed his plea in Municipal Court and Truman changed his mind and elected to stand trial. From that time forward, however, and particularly when it became apparent that the State intended to produce Shuttle as a witness in the Truman trial before he was sentenced, a serious conflict of interest existed.

 The right to counsel is a fundamental right guaranteed by the Constitution of the United States. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Furthermore, a defendant is entitled to the effective assistance of counsel at every stage of a criminal proceeding where substantial rights may be affected. This includes adequate and effective representation of counsel at the time of imposition of sentence. Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). This right "contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942).

It is obvious that Martin's cross-examination of the petitioner at the Truman trial brought to light matters which could prove most damaging to the petitioner at the time of imposition of sentence. These were matters upon which petitioner could well have been advised by counsel to remain silent and which well could have come to the attention of the cross-examining attorney because of the attorney-client relationship between him and the petitioner.

It seems to me that the decision of the court in United States ex rel. Platts v. Myers, 253 F.Supp. 23 (E.D.Pa.1966) is particularly applicable here even though in that case the petitioner stood trial while two witnesses for the prosecution were co-respondents who had pleaded guilty but whose sentences were deferred. Petitioner's attorney had been appointed to represent not only him but his two confederates. The court held that under the circumstances, the petitioner was deprived of the effective assistance of counsel under the Sixth and Fourteenth Amendments of the Constitution of the United States and said, in part, as follows:

The testimony of the two confederates clearly implicated the relator, but the relator's plea of not guilty clearly indicated his contention that he was not involved in the robbery. The lawyer was thus in a very awkward position. On the one hand his job was to present the best possible case for the petitioner, and this involved the impeachment of his other two clients

who were witnesses for the Commonwealth. On the other hand, he also had the task of protecting them. Since the Court had deferred their sentencing until after petitioner's trial, it seems obvious that the severity of their sentences depended in large measure on their testimony against the relator and their general cooperation with the prosecution. If the attorney had succeeded in impeaching these two witnesses for the relator's benefit, he would have destroyed the effectiveness of their testimony and thus vitiated the very factor that would have weighed heavily in their favor when they came up for sentencing. No attorney could have effectively advocated both these positions simultaneously.

It is to be noted that Judge Connarn of the Montpelier Municipal Court failed to advise petitioner of the possibility of a conflict of interest when he appointed Mr. Martin as his attorney and made no inquiry as to whether a conflict of interest was likely to result. This precise situation is well discussed in Morgan v. United States, 396 F.2d 110 (2d Cir. 1968), where Judge Lumbard said that,

> Despite what the appearances may be before trial, the possibility of a conflict of interest between two defendants is almost always present to some degree even if it be only in such a minor matter as the manner in which their defense is presented.
>
> \* \* \* \* \* \*
>
> But we do take this occasion to emphasize that the assignment of counsel in multi-defendant cases should never be a routine matter and should never depend upon the counsel who are immediately available. Where the trial judge assigns the same attorney to represent two or more defendants, he should do so only after conducting the most careful inquiry, as to which a full record should be made, and after sat-

isfying himself that no conflict of interest is likely to result and that the parties involved have no valid objection.

It is my opinion that the petitioner's constitutional right to effective assistance of counsel was impaired to more than a minimal degree by the appointment of Mr. Martin to represent petitioner when he also represented co-respondents, without any investigation on the part of the court as to the possible conflict of interest. I also feel that petitioner's constitutional rights in this regard were further violated when the Washington County Court denied Attorney Martin's motions to be relieved of the defense of Truman because he also represented petitioner who had pleaded guilty and whose sentence had been deferred until after the Truman trial.

It remains to be determined whether petitioner waived his right to assistance of counsel. This is a right that can be waived provided there is an intentional and intelligent relinquishment or abandonment of constitutional rights which are known and understood by the accused. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Having in mind the fourth grade education of the petitioner, who did not know the meaning of the term "conflict of interest," did not know that a conflict of interest was possible or that the court could appoint someone else to represent him who was not associated with his co-respondents, I find that the petitioner did not make an intelligent and intentional relinquishment of his right to counsel and that he did not waive the rights accorded to him by the Sixth and Fourteenth Amendments of the Constitution of the United States.

It is hereby ordered that petitioner be released from custody within sixty days from date hereof unless, during that time, he is retried with the effective assistance of counsel.