OPINION OF THE COURT
Stanley Gartenstein, J.
A major systemic problem concerning the functioning of the Legal Aid Society and its relationship both to this court and to the criminal courts, the existence of which may conceivably threaten the validity of a substantial number of convictions in both forums has surfaced in two cases now before us.
the facts:
In the first case, three young men, one being tried as a juvenile in this court, the other two facing criminal charges as adults in the Criminal Court, were arrested and charged with the perpetration of an act of second degree robbery allegedly committed on January 19, 1982 in Queens County. The Juvenile Rights Division of the Legal Aid Society represents one alleged coperpetrator in this court. The Criminal Defense Division of the Legal Aid *92 Society represents one of the adult defendants in the Criminal Court, and assigned counsel under article 18-B of the County Law represents the other codefendant in that court.
On February 19, 1982, the two adult defendants who were then being held in lieu of bail appeared before the Honorable Allen Beldock in the Criminal Court. A felony hearing was held therein after which both defendants were held for action of the Grand Jury. Because neither of them appeared to be the prime perpetrator, both were paroled pending action of the Grand Jury.
On April 28,1982, the trial of the third alleged perpetrator as a juvenile was commenced before the undersigned. The testimony of the complainant was taken oh record after a statement by the Assistant Corporation Counsel that all discovery material had been served. At the conclusion of his testimony, counsel for respondent called for the production of the District Attorney’s writeup of the Criminal Court case which had not been served-by Corporation Counsel but which, according to a transcript of Criminal Court proceedings produced by him, was deemed discoverable therein, and in fact served upon counsel in those proceedings. It was at this point that the court.first became aware of the fact that the Legal Aid Society represented two of the three alleged coperpetrators of the in-concert crime at issue. The trial was recessed with appropriate admonitions to witnesses, and decision reserved first, on the threshold question of whether or not a conflict of interest existed, and if so, what effect it would have on the future conduct of these proceedings.
In the second case, respondent was arraigned on April 15,1982 for violation of sections 110,160.10, and 155.30 of the Penal Law, acts which if committed by an adult would constitute the crimes of attempted second degree robbery and attempted third degree grand larceny. It is alleged that on April 1, 1982 respondent, acting in concert with two others now before the Criminal Court, did attempt to forcibly steal certain property from the complainant. When the matter appeared before the undersigned, it was necessary to adjourn the trial owing to the fact that a reply to respondent’s omnibus motion was being prepared and, as a *93 consequence thereof, discovery was not complete. In view of the “in-concert” allegations of the petition, the court directed Corporation Counsel to make appropriate inquiry concerning representation of the defendants in Criminal Court. Upon ascertaining that the Legal Aid Society represented alleged coperpetrators of the same act, the Corporation Counsel in turn calendared the matter for the court’s consideration of an application to disqualify the society.
In the court’s experience, it has found that different offices of the Legal Aid Society follow divergent policies with regard to the danger of representing potentially conflicting interests. We have been unable to ascertain the existence of a uniform policy on this question and hence cannot speculate as to the ultimate practical impact of this decision on this motion. Nonetheless, the legal principles to be applied must remain the same.
It is almost seminal that single representation of alleged coperpetrators of the same criminal transaction is prima facie suspect as a conflict situation within the Code of Professional Responsibility (EC 5-16; DR 5-101 [A]; DR 5-105 [B], [C]) and by judicial stare decisis (Ford v United States, 379 F2d 123 [presumed conflict exists in joint representation]). In Matter of Jeffrey M. (62 AD2d 858), an appeal successfully prosecuted by the very same Legal Aid Society which now seeks to represent alleged coperpetrators of the same criminal act, the Appellate Division, First Department, reversed a fact finding based upon the fact that both juveniles before the court were represented by a single attorney. The Jeffrey M. court stated (p 862): “The right to assistance of counsel may be substantially impaired if one lawyer simultaneously represents the conflicting interests of a number of persons charged with [the same] criminal act. While joint representation is not per se a denial of the effective assistance of counsel, the court should recognize that a juvenile may not perceive the existence of a confict of interest in the joint representation.” It has been held that where the slightest tinge of conflict appears, the court need not calculate the precise degree of prejudice to a defendant in order to find a violation of his Sixth Amendment rights (Glasser v United States, 315 US 60).
*94 Where presented with a potential conflict, viz., where the same attorney or law firm represents alleged coperpetrators, it is necessary that a court ascertain whether or not each defendant so represented exercised a knowing and informed waiver (People v Macerola, 47 NY2d 257; People v Hallett, 71 AD2d 815; People v De Leon, 77 Misc 2d 969). This duty of the trial court includes the obligation of fully explaining the ramifications of this situation to a defendant (People v Gomberg, 38 NY2d 307); and, where necessary, to conduct an evidentiary hearing on the question of whether or not a litigant really understood all the dangers inherent in a situation of this type (People v Rivera, 62 AD2d 767). These duties of the court, eminently clear in the case of adult defendants, are so much more compelling where a juvenile is concerned. “Consequently,” the Appellate Division wrote in Matter of Jeffrey M. (supra, pp 862-863) “the court should be satisfied where there is joint representation, that the juvenile’s decision is an informed decision. This requires a discerning, upon the record, of whether each juvenile has an awareness of the risks involved in such joint representation and has knowingly chosen it. At the minimum, there should have been some inquiry of the juveniles and the Law Guardian as to whether joint representation would result in a conflict of interest” (citing People v Gomberg, supra).
It is to be noted that any informed decision concerning joint representation must be that of both alleged coperpetrators so represented. The Appellate Division speaks in the plural. Both defendants so represented must be carefully admonished; they must both execute knowing waivers on record.
With these basic principles serving as a foundation, we next proceed to the status of the Legal Aid Society. In doing s'o, we are met with an argument that the society is a large public defense organization consisting of four separate and distinct divisions, each with its own attorney of record; that pursuant to People v Wilkins (28 NY2d 53), the society is' not one law firm, but that the court in deciding the “one law firm” question, should look to substance rather than form. In Wilkins, a convicted defendant challenged the validity of his conviction by way of coram nobis based upon *95 the belatedly discovered fact that the complainant against him was coincidentally, fortuitously and without knowledge of the individual attorneys so involved, represented by the same Legal Aid Society which also represented him. In affirming the conviction, the Court of Appeals held that lacking a showing of actual knowledge of the dual representation or of a free flow of information within its offices as to defendants being represented, substance must prevail over form, and the society, in the context of the peculiar facts before the Wilkins court, could not be deemed to be one law firm. It is clear that Wilkins is distinguishable from the cases before us in many ways:
1. In Wilkins (supra), the joint representation was inadvertent and discovered after the fact. In these cases, joint representation is a systemic policy of this office of the society;
2. In Wilkins, there was no knowledge of the accidental joint representation. In the cases before us, bearing in mind the full disclosure mandated of the prosecution by the Criminal Procedure Law, the society cannot disown knowledge that it represents conflicting interests;
3. In Wilkins, no free flow of information existed owing to lack of knowledge of dual representation. In the cases before us, either a free flow of information must necessarily follow knowledge of the other’s existence, or the lack thereof would be violative of the fiduciary duty owing by two attorneys to their own law firm and to each other as members thereof;
4. In Wilkins, the conflict was technical at best, stemming as it did from two unrelated cases. In the cases before us, the society seeks to represent alleged coperpetrators of the very same act;
5. In Wilkins, the society, acknowledging its untenable position once attention was called to the conflict, forthwith made application to be removed as counsel. In the cases before us, counsel not only does not move to be relieved, but seeks to continue in the service of two prima facie conflicting interests;
6. In Wilkins, the Court of Appeals refused to impute knowledge of a conflict to different staff attorneys who *96 lacked actual knowledge. On the other hand, we are here faced with actual rather than imputed knowledge.
As stated by the Court of Appeals in People v Gomberg (38 NY2d 307, 314, supra): “Attorneys are under an ethical obligation to disclose to their clients, at the earliest possible time, any conflicting interests that might cloud their representation. Disclosure alone is not enough. The lawyer may not act for his client unless the client has given his informed consent to further representation.”
With the society misplacing reliance on Wilkins (supra) to support its contention that it does not act as one law firm, it is impossible to assume in considering the hundreds, possibly thousands of prosecutions in which this dual representation occurred, that full disclosure was made to both alleged coperpetrators of the same act by Legal Aid counsel both in the Criminal Court and in the Family Court. For, to have done so would negate the stance the society now takes as to the import of Wilkins.
We hold therefore as a matter of law that when the Legal Aid Society represents alleged coperpetrators of the same criminal transaction, it does so (a) with full knowledge that a prima facie conflict exists; (b) that it must affirmatively rebut the presumption of conflict (Ford v United States, 379 F2d 123, supra); (c) that failing rebuttal thereof, it is incumbent upon it to show that both alleged coperpetrators were made fully aware of the conflict and exercised informed waivers thereof. Our ruling therefore must be broken into four parts:
1. In the Matter of Bruce W.
It is clear that once jeopardy attaches, any decision to abort a trial must be made only on the basis of manifest necessity. (United States v Perez, 22 US 579; cf. Hall v Potoker, 49 NY2d 501.) Since the undersigned is the ultimate trier of the facts in a trial already commenced, we respectfully believe that the searching inquiry required by stare decisis should properly be made by another Judge. The society shall be called upon to rebut the presumption of conflict by virtue of dual representation. In the event it cannot do so, it shall be required to show that its dual representation of conflicting interests takes place with the *97 informed consent of both alleged coperpetrators, the adult defendant and the juvenile before us. Inasmuch as the juvenile respondent herein appears with his 19-year-old sister as guardian, we deem it appropriate to appoint a guardian ad litem capable of weighing the subtleties necessary to formulate informed consent to joint representation. Accordingly, a copy of this decision shall be mailed to the Queens County Bar Association with a request to its president to furnish a list of nominees for guardian ad litem willing to serve pro bono. A guardian shall be appointed from this list. We opt for this procedure rather than turning to the “18-B” panel in order to avoid the appearance of self-interest which might be forthcoming had one of its members rendered a report adverse to the position taken by the Legal Aid Society. This matter shall be calendared in intake B for reassignment for the hearing described on a date certain before another Judge. Based upon the ruling of that Judge, this court will either continue the trial already commenced or declare a mistrial.
2. As to Terry C., inasmuch as the trial has not yet commenced, the searching inquiry as required shall be conducted by the undersigned. At the time of said hearing, the society shall be called upon to rebut the presumption of conflict; failing same, it shall demonstrate that full disclosure has been made to both alleged coperpetrators who both consent to dual representátion.
3. As to all cases in which the society represents both a juvenile in this court and a defendant in the Criminal Court as alleged coperpetrators of the same criminal transaction, the society shall prepare a complete list thereof and calendar those cases before the Administrative Judge of this county no later than one week from the date hereof. At that time, the society shall either request to be relieved and assignment of other counsel, or shall be prepared to make the showings set forth in “2” above.
4. As to all new matters:
The function of assigning counsel, Legal Aid or otherwise, is an inherent power of the court (Matter of Stream v Beisheim, 34 AD2d 329). While the court should not interfere with contractual arrangements between the Office of *98 Court Administration and a Public Defender’s office (cf. Matter of Legal Aid Society of Nassau County, N. Y. v Samenga, 39 AD2d 912) it has far-reaching jurisdiction with regard to the supervision of counsel assigned by it or appearing therein toward the end of seeing to it that its operation proceeds smoothly and that counsel operate within the Code of Professional Responsibility. (Matter of Ernest H. v Glasser, 49 AD2d 907.) The Legal Aid Society is a primary resource for Law Guardians to represent juvenile respondents in this court pursuant to the right to contract for this service granted to the Office of Court Administration by the statute (Family Ct Act, § 243, subd [a]). In all matters where it acts as Law Guardian, the society must first be appointed. (Family Ct Act, § 249, subd [a].)
There now exists an informal procedure by virtue of which individual staff attorneys from the society interview respondents in order to be ready to represent them upon arraignment. That the assignment is not made formally before the interview takes place does not presuppose that assignment will be automatic once the interview has been undertaken. It shall henceforth be the duty of every Legal Aid Society staff attorney functioning in this court to ascertain if a colleague from the society represents any alleged coperpetrator of the same act in the Criminal Court. Should this inquiry yield an answer in the affirmative, the interview should then be limited to questions germane strictly to arraignment, viz., parole or remand, community ties, prior record, etc. The representation of an alleged coperpetrator in the Criminal Court shall then be made known to the court which may then assign other counsel of its choice cognizant of the sensitive position of counsel reporting to it. This procedure is in effect in the criminal courts. It serves the dual function of seeing to it that a defendant or respondent is properly represented upon the arraignment without allowing disclosure of any information which would taint counsel’s representation of the codefendant already represented in the Criminal Court or in any way compromising the jealously guarded Sixth Amendment rights of either litigant.
*99 We are confident of the ongoing day-to-day co-operation of the society’s individual staff attorneys toward the end of protecting the rights of a maximum number of litigants while assuring the continued smooth functioning of the court.