OPINION OF THE COURT
John Manning Regan, J.
The following constitutes the written findings of fact which bring this case within the provisions of section 755 of the Judiciary Law and states the court’s conclusions of law in respect to the offense for which the respondent has been found guilty of contempt of court. It also constitutes the order and specific sentence and punishment which the court imposes.
FINDINGS OF FACT
On June 24, 1982, this court, at Trial Term, called the case of People v Lennon for trial by jury. The charges against Lennon involved falsely reporting an accident, leaving the scene, and driving while his license was revoked. Both counsel answered “ready”.
Selection of the jury began about 10:00 a.m. and was completed about 12:45 p.m. During voir dire, the Assistant District Attorney announced his intention to call one Christopher Pellitera to the stand as a fact-witness for the prosecution. This announcement brought no response from any juror, nor, during the morning session, from defense counsel, Joseph Balter, Esq., the Assistant Public Defender who represented Lennon and who is the respondent herein.
However, after the trial had recessed for lunch, and just before the afternoon session was to begin (about 1:50 p.m.) the court conferred in chambers at counsel’s request with the District Attorney and with defense counsel, Mr. Balter. Both attorneys advised that the fact-witness, Pellitera, had been arrested and arraigned that very morning on burglary and larceny charges in Rochester City Court. Moreover, the arraigning Judge had assigned the Monroe *740 County Public Defender’s Office to defend Pellitera on those felony charges (Assistant Public Defender Zambito).
For these reasons, Assistant Public Defender Balter moved before this court to be relieved of the responsibility to represent Mr. Pellitera, alleging that since his felony charges were pending and unresolved, he was “in a position of representing both defendant Lennon, and a witness for the prosecution”, and that since such “representation of the defendant in the instant case would require vigorous cross-examination of Pellitera”, the situation had created “an inherent conflict”. Since the criminal proceedings against Pellitera were still pending, any confidential communication from Pellitera to the Public Defender, Zambito, could not be used against him for the purpose of cross-examination in the Lennon case.
The court ascertained in a series of inquiries that Mr. Balter, himself, was unaware of any information Pellitera may have told Mr. Zambito, and thus he could not use any such confidences in cross-examination of the witness.
Mr. Balter then moved to have the court appoint new counsel for Mr. Pellitera and to permit Pellitera to consult with him before testifying in the Lennon case.
The District Attorney objected to these motions and asked the court to direct the Public Defender to withdraw from the Pellitera case, rather than the Lennon case, in the event of any conflict. The prosecutor also argued that there was no actual conflict demonstrated at this point because Balter had no knowledge of what Pellitera may have told Zambito; and that, further, there was no inherent conflict whatsoever in the situation.
After these arguments concluded, the court ruled that Mr. Balter should tell his superior, the Public Defender, to decide whether to withdraw from the Pellitera case, and to move to do so before the Judge who had assigned him. Moreover, the court ruled that neither the prosecution nor the defense could question Mr. Pellitera about any charge or matters which were then pending against Pellitera. The charges had come about from events wholly unrelated to the charges against Lennon and the court’s ruling was *741 intended to protect Pellitera’s rights against self incrimination.[1]
In response to these rulings, and counsel’s exceptions to them, Mr. Balter replied: “I think it has gone beyond exception at this point. I’m not prepared to proceed until Mr. Pellitera has assigned counsel and has an opportunity to meet with an assigned counsel.”
When the court overruled Mr. Balter, he again replied: “Your honor. At this point, that’s not my objection. That’s the position that I’m taking as an officer of the Court. I will not go forward.” And again he said: “Your honor, with all due respect, if it’s necessary for the Court to hold me in contempt, be that the case, but, I am not going to go on with this case.”
Following these replies, the court recessed. In subsequent exchanges on the record after the recess, respondent, Balter, persisted in his refusal to proceed. Finally, the court said to Balter: “Now, you are telling me you will not continue with the trial. If you do not continue with the trial I must grant a mistrial. I must. If I grant a mistrial, I will punish you summarily for contempt and for your failure to obey my order to continue.”
Another recess proved equally fruitless in respect to changing the respondent’s mind about his refusal to proceed. The court advised that an appeal was readily available as an appropriate remedy for any errors of law, but that: “It’s not a question of whether or not I’m right or wrong on the law. It’s a question of the fact that this is the procedure that we follow. By law, I have made my decision and ruling as a judge, using as much good faith as you are in making your objection. The point is that I am the judge and I’m directing you to proceed.”
Notwithstanding these importunings, the respondent answered: “I can’t proceed”. Whereupon the court found him guilty of contempt and sentenced him to a fine of $250 and ordered him to show cause why he should not be sent to jail. The court stayed execution of its judgment for one *742 week, and its stay of execution has been continued pending the writing of this decision.
CONCLUSIONS OF LAW
Respondent has continuously defended his conduct on the basis of an inherent and irreconcilable conflict between his vigorously pursuing Lennon’s right to the effective assistance of counsel and confrontation of the witnesses against him in cross-examination, and his simultaneous duty in representing Pellitera not to use information acquired in a confidential attorney/client relationship with Pellitera against him. Moreover, at the trial, Pellitera’s right to be free from self incrimination might possibly conflict directly with Lennon’s right to impeach him on cross-examination. All these rights belong to both Pellitera and Lennon by virtue of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and, accordingly, respondent Balter claimed to be justified in refusing to proceed.
The court, at the trial, chose to protect Pellitera’s Fifth Amendment rights against self incrimination in advance by ordering both counsel not to question him about the pending charges. But it chose to defer judgment on the question of any conflict with Lennon’s Sixth Amendment rights to counsel and confrontation until Pellitera had taken the stand and had testified for the People.
Respondent’s refusal to proceed nullified the court’s decision and caused a mistrial.
The first issue, then, is whether the defense of legal justification can be urged in a proceeding in summary contempt under article 19 of the Judiciary Law. Respondent says his own professional judgment to protect the constitutional rights of his two clients takes precedence over his duty to obey the court, and justifies his refusal to proceed to trial.
Whether justification exists as a defense to summary criminal contempt is a question of first impression. The statute, section 35.05 of the Penal Law, defines justification generally as follows:
*743 “conduct which would otherwise constitute an offense is justifiable and not criminal when:
“1. Such conduct is required or authorized by law or by a judicial decree, or is performed by a public servant in the reasonable excercise of his official powers, duties, or functions”.[2]
The court will isolate the argument further. Respondent Balter urges justification because he believes his conduct was required or authorized by constitutional law; specifically, he interposes his judgment as to the manner in which his client’s constitutional rights shall be preserved during trial between the court’s order to proceed and his duty to obey that order. He concludes that his primary duty is to his clients and to his own professional judgment. Therefore, he says, the court’s order to proceed was lawfully disregarded.[3]
Justification as a codified legal defense to criminal behavior is a relatively recent development in New York. It *744 first appeared in chapter 1030 of the Laws of 1965 during the general revision of the old Penal Law. It normally applies in prosecutions for violent crimes as variations on the defense of self-defense. But although six subdivisions of the statute, by their language, apply only to physical force situations, the first subdivision applies generally to all offenses. That means justification, by statute, is a defense to the offense of criminal contempt. (Penal Law, § 215.50.)
This court must therefore conclude that justification is also a defense to proceedings in summary criminal contempt under article 19 of the Judiciary Law, because the Supreme Court of the United States has held that the offenses of criminal contempt under section 215.50 of the Penal Law and the offenses of criminal contempt under section 750 of the Judiciary Law are the same. (Colombo v New York, 405 US 9.) Our Court of Appeals has since acknowledged the identity of these two statutory offenses (People v Colombo, 31 NY2d 947).[4]
The questions which remain then are:
(1) What are the elements of the defense of justification in this criminal contempt prosecution and
(2) Have the elements been established here?
This case does not invoke circumstances such as lack of notice, understanding, impossibility and the like. The respondent admits willful disobedience to the order of the court. His defense pits one set of legal rules against another and asks to know which shall prevail. It is the judgment of the court that, in this case, the order to proceed to trial transcended the personal, good-faith decision of the respondent to disobey for the sake of his duty to his client.
Willful disobedience to the direct order of a Trial Judge to proceed with the trial of a case committed in his presence is a grave violation of the established rules of trial *745 procedure. Were this court to suffer such disobedience in any but the most exceptional cases, the orderly administration of criminal justice would surely collapse. Only the threat of an immediate, irreparable injury to an obvious and fundamentally valuable right could justify such behavior — especially such behavior by a lawyer. The impact of the threat must be equivalent philosophically, to the impact of the physical threat to life in cases of self-defense. Thus the question here is whether the conflicts of interest asserted in this case meet the test of immediate, irreparable injury to an obvious and fundamentally valuable right.
Respondent’s citations to Holloway v Arkansas (435 US 475) and Glasser v United States (315 US 60) to show that these types of threats existed in the supposed conflicts he faced are totally misplaced. In each of those cases, the issue involved was defense counsel’s simultaneous representation of multiple defendants accused of the same crimes. Representation of codefendants by the same attorney during the course of a criminal trial has long been held the most commonplace example of inherent conflicts of interest. The American Bar Association’s code provisions publishing the standards for the conduct of criminal justice has erected a clear-cut rule against it. (See ABA Standards for Criminal Justice [2d ed], Standard 4-3.5.) But even this rule allows exceptions for informed consent in unusual situations.[5] Nevertheless codefendants are not at all involved in this case. Moreover, Holloway specifically disavowed the idea that an attorney’s conscientious assertions of a conflict of interest controlled the trial court’s authority. The court held (pp 486-487):
“The State argues, however, that to credit Hall’s representation to the trial court would be tantamount to transferring to defense counsel the authority of the trial judge to rule on the existence or risk of a conflict [of interest] * * *
“[0]ur holding [does not] preclude a trial court from exploring the adequacy of the basis of defense counsel’s representations regarding a conflict of interests without improperly requiring disclosure of the confidential communications of the client.”
*746 Holloway posits two conventional and widely recognized conflict of interest situations. The first, a single attorney simultaneously representing codefendants in a criminal case; and the second, the use of confidentially acquired and/or disclosed information from one client against the interest of another client, or the interest of that same client on behalf of another client. Neither situation obtains here.
Here Lennon is the client entitled to immediate representation. He is the person on trial. Pellitera is a fact-witness for the prosecution. As a witness, he is not charged, nor is he in a setting even requiring legal representation. At least, not yet. Until he testifies as a fact-witness, his legal interests are potential only. What Pellitera was entitled to as a witness was freedom from self incrimination, not freedom from his duty to testify. Beforehand therefore, the court prohibited counsel from questioning Pellitera on any facts surrounding the pending charges of burglary and larceny. Whether that ruling would have unduly restricted Lennon’s right to impeach Pellitera on cross-examination had to abide the event of his direct testimony. It could not be assumed or surmised or even predicted what that direct testimony might be.
Additionally, the court and the respondent had already eliminated, before the order to proceed to trial was issued, any question of breach of confidentiality.
Thus, at the time the court ordered the respondent to proceed both familiar examples of conflict of interest, which Holloway had recognized, had been removed from the case. And since Holloway had never held that defense counsel’s personal judgment usurped the trial court’s judgment on the question of whether a conflict of interests exists, the respondent’s defense of justification cannot meet a test requiring a demonstrated threat of immediate, irreparable injury to an obvious and fundamentally valuable constitutional right.
Respondent also contends that canon 9 of the Code of Professional Responsibility prohibiting even the appearances of professional impropriety sustains his refusal to proceed with the trial, citing as authority People v Shinkle (51 NY2d 417).
*747 Shinkle held that a former Public Defender turned prosecutor could not prosecute, nor could anyone in the office with which he was associated prosecute, any person he had previously represented as a Public Defender.
What analogy there may be between Shinkle and this case is putative and murky at best. In a city the size of Rochester, the Public Defender will confront as witnesses many of the persons he has represented as defendants. Does that simple fact preclude his effectiveness at cross-examination? Does it warrant the current defendant’s suspicion of less-than-adequate representation? Nonsense. An appearance of professional impropriety does not imply a presumption of dishonor. As the Second Circuit recently remarked: “[An] appearance of impropriety is * * * too slender a reed on which to [grant] a [motion for an attorney’s] disqualification.” (See Board of Educ. v Nyquist, 590 F2d 1241, 1247.)
Clearly, also, it is too slender a reed on which to found the defense of justification to the willful violation of a court order to proceed with the trial of a case, which violation, it must be observed, creates a far greater appearance of impropriety.
For the above reasons, the court dismisses the defense of justification and finds the respondent guilty of contempt of court in violation of section 750 of the Judiciary Law.
SENTENCE AND PUNISHMENT
In accordance with sections 751 and 755 of the Judiciary Law, the court prescribes as punishment the maximum fine of $250, to be paid from personal, not public, funds within 30 days from the date of service and entry of this order; and a conditional discharge of one year, the condition being, that pending final discharge, respondent not give any other tribunal probable cause to cite him for contempt.
The court has heard respondent on the question of incarceration. It finds that Mr. Balter has had some prior experience as a trial attorney but has been admitted to practice for less than five years. Given these facts, and his good-faith intentions to represent his clients’ interests, albeit somewhat overzealously, the court finds that no *748 sentence of imprisonment is indicated. Nor can the court condone or support any further consequences, such as suspension or disbarment (cf. Matter of Isserman, 345 US 286; 29 NYU L Rev 517) from these findings and from this judgment.

. Actually, at the time these events occurred in the Lennon trial, Zámbito had already pleaded Pellitera guilty of misdemeanors, reduced from the felony charges. But no one in the Lennon case knew this, nor did anyone learn of it until after the court had declared a mistrial.

. Subdivision 15 of section 10.00 of the Penal Law defines a “ ‘[plublic servant’ ” as any employee of the State or political subdivision, either elected or designated. Obviously, respondent Balter is a public servant as so defined. However, the court shall disregard that classification in this case because Balter was acting as an attorney at law and officer of the court and that status alone will govern this case. Otherwise, the statute would grant to public attorneys a defense not accorded to private attorneys during the discharge of identical duties to the court — a situation legally intolerable under these circumstances.

. The law has learned many bitter lessons, but none more bitter than whether to sanction defiance to established legal authority. The Nuremberg trials fixed capital criminal guilt on government officials who pleaded the defense of obedience to orders from higher legal authority. If the law can find them guilty for obeying orders, then the law must provide a defense of justification for disobedience to orders. They cannot be punished for both.
“Nor should such a defense be recognized as the obsolete doctrine that a head of state is immune from Legal liability * * * We do not accept the paradox that legal responsibility should be least where power is greatest. We stand on the principle of responsible government * * *
“With the doctrine of immunity of a head of state usually is coupled another, that orders from an official superior protect one who obeys them. It will be noticed that the combination of these two doctrines means that nobody is responsible. Society as modernly organized cannot tolerate so broad an area of official irresponsibility.” (Report to President Truman from Justice Robert H. Jackson, Chief United States Counsel in the prosecution of Axis war criminals, June 7, 1945.)
In this case, the court faces a respondent who urges a defense to his disobedience — justification. Because I agree with what Justice Jackson wrote in 1945, I must, consistent with that belief, afford the respondent his defense.

. Actually, the Colombo cases held that conviction and punishment under article 19 of the Judiciary Law barred subsequent prosecution on the same facts under section 215.50 of the Penal Law for criminal contempt, notwithstanding the provisions of section 215.55 of the Penal Law which permitted double prosecution.

. The three dissenting Justices in Holloway opposed any adoption of a per se or ipso facto rule in conflict of interest cases.