[No. 23023–9–I.   Division One.   June 10, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. RONALD CLEO EDISON, *Appellant.*

*Quentin Steinberg,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Arthur R. Chapman, Deputy,* for respondent.

PEKELIS, J.—Ronald Cleo Edison appeals his conviction for one count of burglary in the first degree, one count of rape in the second degree, and one count of unlawful imprisonment. Edison contends that he was denied his right to counsel; or alternatively, he asserts that he was deprived of his right to effective assistance of counsel. Edison also contends that there was insufficient evidence to support his conviction.

## I

C.W. testified that in March 1988 she was living with her mother. She had been looking for her own apartment since January. On March 15, 1988, at about 3 p.m., C.W. drove by the Newport Hills Townhouses and noticed Ronald Cleo Edison working on the grounds. From October 1986 through March 1987 C.W. and Edison had been involved in an affair. At that time, C.W. was single and Edison was married. During their affair, C.W. and Edison engaged in consensual sex. According to C.W., eventually she broke off the affair. C.W. and Edison had not seen each other for more than a year.

C.W. stopped and told Edison she was looking for an apartment and asked if there was a vacancy. Edison claimed that there was and offered to show it to her at 7:30 that night. C.W. accepted and they agreed that Edison would pick her up at her mother's later that evening.

Edison arrived at C.W.'s house at around 9 p.m. He and C.W. sat on the couch and had a drink. C.W.'s daughter was also at C.W.'s house that evening. She testified that after Edison and C.W. had a drink, C.W. left with Edison. C.W. told her daughter that she would be back in about a

half an hour to an hour and that she should go to bed. C.W.'s daughter watched them leave and saw them kiss in the driveway.

Edison and C.W. drove to Fred Meyer. Edison bought a bottle of wine, and then drove to another store and purchased two cups. They had a few glasses of wine in the car, before driving to the Newport Hills Townhouses. Edison and C.W. went into apartment 282 together and looked around. At one point, Edison left for a short time. C.W. testified that when Edison came back, he locked the door, put the chain on, and tried to kiss C.W. She said "no, leave me alone"; he continued to try to kiss her and she pushed him away with her hands. She then asked him to take her home. C.W. testified that Edison continued to try to kiss her and take off her clothes, and that she kept telling him to stop and trying to push him away. She explained at trial that she did not try to run out of the apartment because "the door was locked, it was chain locked and locked bottom . . . I would never have made it out the door trying to get the chain off and unlock the door."

C.W. testified that eventually Edison took her clothes off, threw her down on the floor, and forced her to have intercourse. C.W. then went into the bathroom and sat on the toilet. She told Edison that she did not feel well. Edison dragged her back into the living room, pushed her on the floor, and raped her again. C.W. kept telling him to stop and trying to push him away. C.W. testified that she did not hit Edison because she was scared. She explained that she had "never seen him like that before. And if [she] hit him, no telling what he would have done."

C.W. testified that she tried to put her clothes back on. At that point, Edison grabbed her face, and cut her face and mouth with his hands. Edison then attempted to drag her upstairs, and although she resisted, he raped her on the stairs. C.W. went back into the bathroom and said she was sick. Edison grabbed her, raped her, and urinated on her. C.W. testified that throughout the evening she resisted. In

addition, she testified that she repeatedly spilled wine on the carpet, in an attempt to distract Edison.

Edison then went to an upstairs bathroom in the apartment. C.W. hastily picked up some of her clothes and ran out the door. She left behind her underwear, one shoe, and some other items.

One of C.W.'s friends lived in the Newport Hills Townhouses. C.W. ran and banged on the door to what she thought was her friend's apartment. Lesley L. Florer, the owner of that apartment unit, opened the door. Florer testified that when she heard the banging, at about 4:15 a.m., she looked out her window and saw a woman, who she later identified as C.W., "running away, frantic, crying awful".

When Florer opened the door she noticed that C.W. was "disheveled" and looked "like she didn't fully put her clothes on". Florer also noticed that C.W. had a "very large, swollen, lacerated lip." C.W. was holding a bra and one shoe. Florer asked her what she needed and C.W. told her that she had been raped. Florer let C.W. in and called the police. C.W. told Florer that Edison had raped her, and that she had repeatedly spilled wine on the carpet to distract him. Florer testified that C.W. was very anxious and upset, and that she cried periodically.

The police took C.W. to the emergency room at Overlake Hospital. Susan Elliott, a registered nurse, spoke with C.W. Elliott testified that C.W. was upset and crying. In addition, Elliott noted that C.W. had "some bruises about her face and there were stains and a swollen lower lip." Elliott recited portions of C.W.'s emergency room medical records. The records indicated that C.W. had lip abrasions, scattered bruises to the abdomen, a small tear on the vaginal wall; and, that she complained of pain in the left breast, shoulder and lower left hip.

Gary N. Woodring testified that he owned apartment 282 in the Newport Hills Townhouses. He explained that the apartment was vacant in March 1988. He did not know Edison and had never given him permission to enter his apartment.

King County Police Officer David P. Hood responded to Florer's call. Hood testified that when he arrived, C.W. appeared "disheveled and upset" and "she was on the phone talking to someone in hysterics." C.W. was wearing pants and socks, holding a shoe, and her sweatshirt was inside out. C.W. told Hood that Edison had raped her and stated: "[H]e caught me, he tortured me and he peed on me and I kept putting my shirt on and he kept taking it off and he twisted my arm behind my back like a police officer would and he raped me." C.W. also told Hood that she kept spilling wine to distract Edison.

C.W. subsequently pointed out Edison's car to Hood. Hood ran a computer check and found Edison's address and apartment number. Hood took C.W. home and returned to the Newport Hills Townhouses with other officers. They went to Edison's apartment and arrested him.

King County Police Detective James J. Knauss processed apartment 282 and conducted a follow-up investigation. He testified that he arrived at the apartment at about 5:30 a.m. He made observations and took photographs. Knauss found numerous purple stains, consistent with spilled wine, in different areas around the apartment. Knauss also spoke with Edison. Edison gave Knauss a tape recorded statement in which he contended that the sexual contact between him and C.W. was consensual. At trial, Edison again claimed that he and C.W. engaged in consensual intercourse. He added that C.W. was angry with him and that she asked him why he had ended their relationship.

King County Police Lieutenant Rebecca Susan Norton was also involved in the follow-up investigation. Norton testified that she contacted C.W. on March 16, 1988, at about noon, and took some photographs of her. The photographs were admitted into evidence and showed C.W.'s bruises.

## II

On March 18, 1988, the State charged Edison with burglary in the first degree (count 1), rape in the second degree

(count 2), and unlawful imprisonment (count 3). Edison retained attorney Robert L. Erickson to represent him.

On July 26, 1988, Erickson was suspended from the practice of law for violation of the continuing legal education requirement. He was reinstated on August 4, 1988. While suspended, he did not withdraw from his representation of Edison. According to Edison, Erickson never told him about the suspension.

On August 15, 1988, a jury trial commenced. On August 22, 1988, the jury found Edison guilty on all three counts. That same day, Edison filed a notice of appeal. On September 1, 1988, Erickson filed a motion for arrest of judgment or a new trial under CrR 7.4 and 7.6. He argued that there was insufficient proof as to material elements, the verdict was contrary to the law and evidence, and that substantial justice was not done. On October 1, 1988, Edison wrote a letter to the trial judge. Edison contended that he was not guilty, and that he felt he had been convicted because he did not receive effective assistance from Erickson.

On October 7, 1988, the trial court entered judgment on the verdict and sentenced Edison to 41 months on count 1, 48 months on count 2, and 12 months on count 3, to run concurrently. In calculating Edison's sentencing range, the trial court used the other two counts in computing his offender score on each count. Erickson did not argue to the trial court that the three counts encompassed the same criminal conduct.

On March 27, 1989, Erickson transferred to inactive status. Subsequently, the court appointed Robert Goldsmith to represent Edison. On August 1, 1989, Goldsmith filed a motion for relief from judgment under CrR 7.8. Edison made the same arguments he raises here on appeal, claiming that he was entitled to a new trial on the basis of irregularity in obtaining judgment and fraud.

By a letter to Goldsmith dated December 27, 1989, the trial court denied the motion. The trial court found that Edison was not deprived of his right to counsel or his right

to effective assistance of counsel. The trial court also found that if there was any error in sentencing, it could be cured by resentencing.

On February 16, 1990, the trial court determined that Edison's offenses encompassed the same criminal conduct. Accordingly, the trial court corrected its earlier sentencing error and resentenced Edison to 20 months on count 1, 27 months on count 2, and 2 months on count 3, to run concurrently. The trial court then entered an amended judgment and sentence, and Edison filed an amended notice of appeal.

### III

On appeal, Edison contends, as he did to the trial court, that his motion for relief from judgment under CrR 7.8 should have been granted first because he was denied his right to counsel. Edison contends that he need not prove that he was prejudiced because Erickson's suspension for a 2–week period during his representation of Edison constitutes a per se denial of Edison's right to counsel.

To support this proposition, Edison relies on numerous cases in which courts have held that defendants were denied their right to counsel. *See, e.g., Seattle v. Ratliff,* 100 Wn.2d 212, 218, 667 P.2d 630 (1983); *Cheatham v. State,* 364 So. 2d 83, 84 (Fla. Dist. Ct. App. 1978), *cert. denied,* 372 So. 2d 471 (1979); *Huckelbury v. State,* 337 So. 2d 400, 403 (Fla. Dist. Ct. App. 1976); *People v. Felder,* 47 N.Y.2d 287, 391 N.E.2d 1274, 1276, 418 N.Y.S.2d 295 (1979); *People v. Washington,* 87 Misc. 2d 103, 384 N.Y.S.2d 691, 692 (1976).[1]

---

[1] Edison also points to *Glasser v. United States,* 315 U.S. 60, 71, 86 L. Ed. 680, 62 S. Ct. 457 (1942), and *Holloway v. Arkansas,* 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978). However, both cases involved codefendants who were represented by a single lawyer, even though they had conflicting and inconsistent defenses at trial. Since that is not the issue here, these cases are inapposite.

In *Ratliff,* the court held that "representation by a law student intern who fails to comply with the conditions placed upon his or her practice does constitute an absolute denial of the right to counsel". *Ratliff,* 100 Wn.2d at 219. The court further held:

> No showing of prejudice from such error need be made. While almost all courts require a showing of prejudice when a defendant claims ineffective assistance of counsel, an outright denial of counsel is conclusively presumed to be prejudicial. Denial of representation by one actually authorized to practice in court constitutes a denial of counsel, not merely ineffective assistance.

(Citations omitted.) *Ratliff,* 100 Wn.2d at 219–20.

In the other cases Edison relies on, the courts held that the defendants had been denied their right to counsel where their counsel had never been licensed. In contrast, Erickson was admitted to the bar, and his failure to complete his continuing legal education requirements would not logically affect his ability to ensure Edison a fair trial.

■■ Edison cites no authority for the position that suspension itself, without a showing of prejudice, constitutes a denial of the right to counsel. Because the two are entirely different, we decline Edison's invitation to hold that having a lawyer who has been suspended should be treated the same as having one who has never been licensed.

Having rejected a per se rule, we address the issue of whether under the circumstances present here, Erickson's suspension resulted in a denial of Edison's right to counsel. First we must decide whether Erickson's suspension occurred during a "critical stage" of Edison's case.

Defendants are afforded a constitutional right to counsel at any "critical stage" of criminal proceedings. *See Kirby v. Illinois,* 406 U.S. 682, 690, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972); *United States v. Wade,* 388 U.S. 218, 224, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). The United States Supreme

Court has characterized "critical stages" as "proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality." *Wade,* 388 U.S. at 224. In determining whether a particular proceeding constitutes a "critical stage", courts analyze "whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *Wade,* 388 U.S. at 227. Here, no proceedings whatsoever took place during Erickson's suspension. It is therefore problematic to conclude that the suspension occurred during a critical stage.

However, even if this period were a critical stage, Edison must show that Erickson, though technically suspended, actually failed to function as counsel. This he is unable to do. There is no evidence that Erickson stopped working on Edison's case during his suspension. In fact, as Edison points out, the evidence shows that Erickson continued to represent Edison by signing subpoenas and directing an ongoing investigation. Erickson worked on Edison's case before and after the suspension. In addition, following Erickson's reinstatement, there was ample time—11 days—to prepare for trial.

We conclude, therefore, that Edison has failed to show that he was prejudiced by having Erickson as his counsel during the 2–week suspension period. Thus, Edison was not denied his right to counsel.[2]

The remainder of this opinion, wherein we reject Edison's other assignments of error and affirm his conviction, has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

---

[2]Edison also contends that a per se absence of counsel rule should apply to Erickson's failure to inform Edison and the court of his inactive status. This argument is not supported by legal authority. While this failure may constitute fraudulent conduct and ethical violations under the Rules for Lawyer Discipline and the Rules of Professional Conduct, Edison must show actual prejudice. Since there is no evidence that these violations affected the outcome of Edison's case, he has not shown deprivation of his right to counsel.

Affirmed.

GROSSE, C.J., and SCHOLFIELD, J., concur.