**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5067

ARTHUR MCKINLEY WATSON, a/k/a
Red,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                        No. 95-5068

JAMES DONALD WATSON,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                        No. 95-5082

WINFRED WESLEY WATSON,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                        No. 95-5097

BILL HALL,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 95-5293

BRIAN ROC WATSON,
Defendant-Appellant.

Appeals from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
William L. Osteen, Sr., District Judge.
(CR-94-139)

Argued: December 8, 1995

Decided: September 17, 1996

Before WILKINSON, Chief Judge, and WIDENER and
HAMILTON, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Widener wrote the opinion,
in which Chief Judge Wilkinson and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Lee W. Kilduff, MORCHOWER, LUXTON & WHA-
LEY, Richmond, Virginia; Robert Lynn McClellan, IVEY, IVEY,
MCCLELLAN & GATTON, Greensboro, North Carolina; W. David
Lloyd, LLOYD & LLOYD, Greensboro, North Carolina, for Appel-
lants. David Bernard Smith, Assistant United States Attorney/Senior
Litigation Counsel, Greensboro, North Carolina, for Appellee. **ON
BRIEF:** Daniel S. Johnson, LAW OFFICE OF DANIEL S. JOHN-
SON, Winston-Salem, North Carolina, for Appellant Hall; Donald K.
Tisdale, TISDALE, HOLTON & MENEFEE, P.A., Winston-Salem,

2

North Carolina, for Appellant Brian Watson. Walter C. Holton, Jr., United States Attorney, Greensboro, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

WIDENER, Circuit Judge:

In these five consolidated appeals, defendants-appellants Arthur McKinley "Red" Watson, James Donald Watson, Winfred Wesley Watson, Brian "Roc" Watson, and Bill Hall challenge their convictions and sentences for drug related offenses. We affirm the district court's conviction and sentence as to each appellant.

In June, 1994, a federal grand jury indicted the Watson defendants and Bill Hall with conspiracy to possess with intent to distribute, and to distribute diazepam (Valium) and over 100 kilograms of marijuana. The Watsons are related. Bill Hall is unrelated.

A partial recitation of the testimony entitled to belief by the jury follows.

At trial, the government offered testimony from Dennis Gale, an admitted marijuana dealer testifying under a plea agreement. Gale met Brian in 1990 or 1991 and began to front Brian 10 to 15 pounds of marijuana for distribution every 10 to 14 days. Through Brian, Wesley learned Gale could distribute 50-200 pound quantities of marijuana and went to Gale's residence with Brian to meet him. Gale testified that Wesley "was getting in marijuana also," and the two discussed how marijuana was packaged to prevent detection, the kind of marijuana, and the locations from which their shipments originated. Gale's marijuana came from the southwestern United States and was packed with coffee grounds and pepper and wrapped with newspaper from places such as Nogales, Arizona and Brownsville, Texas. Wes-

3

ley agreed that his marijuana came from the same areas and, Gale testified, "[t]hey mentioned they had been to those type of areas themselves."

Wesley also discussed the seizure, from him, of over $10,000 in cash during a trip from South Carolina to Atlanta in May, 1992. Gale testified Wesley told him he was en route to Atlanta to buy marijuana when the money was seized, and that "they were trying to get it back, but it was going to cost money," because the origin of amounts over $10,000 must be proven. Wesley offered to sell Gale 50 to 100 pound quantities of marijuana for $1400 per pound and diazepam, a form of Valium. Gale told Wesley he might be interested in the marijuana at $1000 per pound but not in the Valium.

Gale testified that in 1992, Brian introduced him to Andy Holcomb, a co-worker, who joined Brian in distributing marijuana. On one occasion, Brian and Holcomb left Gale's house with 12 pounds of marijuana and were arrested when they tried to avoid a roadblock. The pair had been drinking and had rifles and scales in the car, besides the marijuana. Gale became scared because Holcomb "knew a lot, really, about everything that was going on." Along with Wesley and Brian, Gale met Holcomb at a donut shop in Winston-Salem "to kind of instruct him on how to handle himself." The three didn't want to "leave him [Holcomb] out in the cold on the situation, whose marijuana it was and where it was coming from." Wesley recommended an attorney to represent Holcomb, and agreed, along with Gale and Brian, to help pay his attorney's fees. Gale personally gave Holcomb about $2,500 for his attorney.

Gale recalled that Brian became hospitalized for a month and fell $3-4,000 dollars behind paying for marijuana. To settle the debt, Brian told Gale that Wesley had a quantity of marijuana coming in and offered him a 33-38 pound deal at $1100 a pound with a $100 per pound discount to apply to the debt. Gale agreed, and a week later Wesley showed up at Gale's house with the dope. Wesley accepted $9,000 down and offered Gale another deal at $1,000 per pound for 50-100 pounds, a cash transaction. When Wesley collected the balance Gale owed for the first deal, he explained that the 50-100 pounds for the next deal would come from a 300-400 pound shipment he was expecting. Gale agreed to buy, but when a month went by with no

4

word from Wesley, Gale determined from Brian that the shipment had been smaller than expected.

Gale testified that he and Wesley entered into "some type of a partnership," in which Gale agreed to sell and pay for "any amount of marijuana that was fronted to me." Until Gale's arrest in February 1994, he saw Brian quite often "if he [Brian] needed marijuana or wanted to square up what he owed," and said that Brian "would speak about it, you know, they got in a little bit of marijuana . . . he would tell me that his dad got in probably 100 to 125 pounds, 150 pounds." Gale also saw Valium in Brian's possession and discussed buying Valium from him.

Through Wesley, Gale met Don Watson, also in 1992. In the fall of 1993, Don approached Gale in a bar they both frequented called the Silver Fox. Don told Gale that Wesley "had some marijuana, but it wasn't enough, that he needed more, that he had run out," and Don "asked if he could get some from me [Gale] periodically, to make up for the difference." From then until Gale's arrest, Gale supplied Don with 10-15 pounds of marijuana every one to two weeks. Gale made deliveries at several places including a car shop Don operated. Don paid Gale "most of the time at the Silver Fox on Sunday nights."

Besides dealing drugs, Don and Gale discussed Brian and Wesley's activities. Gale testified that Don might say "he didn't need any marijuana because Wesley had brought in some marijuana, and he had enough to make it through." Gale testified Don "would say, well, you know, Wesley got in a certain amount, like -- roughly, this was roughly, it was 125 pounds, and he didn't get but 25 pounds and . . . he would need, you know, possibly 10 pounds this week instead of 20, or seven pounds instead of 15." On May 6, 1993, Don was arrested with defendant Bill Hall in possession of over 116,000 Valium pills in Hall's trailer. Hall had just returned from driving Don's brother Red to Laredo, Texas the night before the arrest, and the evidence showed that Red and Hall smuggled the Valium into North Carolina with a shipment of Mexican pottery. Gale testified that Don discussed the circumstances of the arrest with him. Portions of Gale's testimony were later corroborated by his wife, Karrie Gale, and employee, James Paul Booth.

5

The government also called on a witness, Wendell Neal, an employee at Don Watson's auto shop from the latter part of 1991 through April or May of 1993. Neal had been arrested on drug charges in the spring of 1993 and had agreed to provide information to North Carolina law enforcement authorities on his observation of activities at Don Watson's car shop. Neal knew Wesley, but met Red Watson, Brian Watson, and Bill Hall while working for Don. Neal testified that after about six months at Don's, he became involved in distributing marijuana and Valium. His first transaction involved a pound of marijuana fronted to him by Wesley. Neal paid Wesley for the dope at Don's home after it was sold. Later, Neal bought marijuana from both Wesley and Don.

In the Spring of 1992, Wesley and one Keith McGhee entrusted Neal with three boxes, each containing over 10 pounds of marijuana. Neal kept the boxes at his house for a night, and helped Wesley repackage the drug in Neal's father's garage the next day. After the repackaging, Wesley left Neal with nine pounds of marijuana to hold for Don. Neal found a buyer for the drug, however, but could not contact Wesley for permission to sell. Neal sought and received permission to sell from Don, whom Neal said told him "go ahead and sell it; that's what we were there for, to make money." Neal was cheated, however, the drugs were taken and he never got paid. Neal told Wesley what happened and asked him to keep it between the two of them but "within a matter of days Don knew it, and several other people." After being cheated Neal stopped buying marijuana from Wesley, but during the fall of 1992 through the Spring of 1993, he purchased two pounds a month from Don.

Neal also testified that he bought Valium from Don and was present when Don left Valium in his shop that was picked up by Bill Hall. From time to time, Don showed Neal a note pad containing records of Don's Valium dealings.

Neal was also privy to the handling of money. He observed Wesley and Don Watson and Keith McGhee with money bagged for a trip "to south of Georgia." This was the money that Gale testified Wesley told him was to be used to buy marijuana and which was confiscated from Wesley during a traffic stop in South Carolina. To prove a legitimate origin for the cash, Wesley asked Neal to sign an affidavit apparently

falsely swearing that Neal had loaned him some of the money. On another occasion, Wesley was worried about having a paint can "packed with money" in his possession. Wesley gave Neal the can to hold at Don's instruction, and recovered it from Neal several days later in Keith McGhee's driveway. In April of 1993, shortly before Don and Bill Hall were arrested with Valium, Neal was working late at Don's shop when Don came in with a bag full of wet money packed in orange plastic bags and asked Neal to help him count it. Neal counted about $15,000 - half of the total- and helped Don roll it up into clean bags and tape it inside the spare tire of a red Chevrolet S-10 truck. He then informed the state authorities about the money. A few nights later, when Bill Hall returned from Texas, Neal took a message from him to tell Don that Hall was home. After that, Neal learned from TV news that Don and Hall had been arrested.

One Deborah Davis testified that in the fall of 1990 she and Tracy Powell, a friend, roomed with a drug dealer named Hobart Crotts in Lexington, N.C. Miss Davis testified that Crotts had a business selling pottery but also sold marijuana and Valium obtained from Wesley and Red Watson. Miss Davis testified that on one occasion she and Miss Powell accompanied Crotts to what she believed was Wesley Watson's house. Crotts parked his car and went into the garage, where Miss Davis saw Wesley and Red. Crotts spoke to Wesley, then Wesley and Crotts carried a large bag containing 5 to 8 pounds of marijuana out to the car in which Miss Davis and Miss Powell were waiting, and Crotts handed Miss Powell a quantity of Valium pills. Crotts then went back into the garage where Miss Davis watched him speak with both Wesley and Red until Red pulled the garage door down. Miss Davis later saw Crotts weigh and distribute the marijuana and pills to other dealers.

Andy Holcomb, Brian Watson's co-worker, testified for the government as well. Holcomb corroborated Dennis Gale's testimony that Gale, Wesley, and Brian met him in a donut shop following his arrest for conspiracy with Brian on marijuana charges, to discuss his testimony and legal representation. Holcomb confirmed that Wesley suggested an attorney to represent him and offered to pay his legal fees. Holcomb testified that he engaged in ten drug transactions through Brian Watson. He detailed one transaction in June of 1992 in which he received two pounds of marijuana and 1,000 Valium pills. Wesley

7

delivered the drugs, meeting Holcomb and Brian in the parking lot of a fast food restaurant. The Watsons fronted Holcomb the drugs, and he paid Brian for them when they were sold.

The government presented testimony from police witnesses that described the execution of search warrants on Don Watson's business and Don and Red's residences in March, 1992, showing the defendants connection to Laredo, Texas. They also described the May 6, 1992 traffic stop of Wesley Watson and confiscation of $56,781 in cash, and the execution of a search warrant on the residence of defendant Bill Hall on May 6, 1993 that resulted in Hall and Don Watson's arrest and the seizure of over 116,000 Valium pills. The search of Don's shop turned up telephone bills reflecting calls to Laredo, Texas. At both Don and Red's residences, police found a variety of documents relating to Laredo, including, at Red's, a Mexican prescription for Valium.

Police testimony tied a white Isuzu truck to Don Watson's business and Red Watson's residence throughout 1992. The same white truck was found outside Bill Hall's residence on the day he and Don were arrested with the Valium. Hall testified that Don Watson asked him to drive Red to Laredo, Texas and back for $500 plus expenses. Hall agreed because he was out of work, although he did not have a valid driver's license and was using a phony one made up in the name of a deceased cousin, Robert Hall. In Texas, Red complained he was ill and would fly home, so Hall drove the Isuzu back to North Carolina alone, arriving late in the evening of May 5, 1993. When police executed the search warrant on Hall's trailer on May 6, 1993, Hall was just outside and Don was inside the trailer. Also inside, spread out in the kitchen area, were Valium pills, plastic bags, a scale, and razor blades. Police also found a theme book that was blank except for the last two pages which contained cryptic notations of names and numbers including that Red has owed and paid various sums, and Wesley was in the book in connection with certain numbers.

One Shull, a pottery dealer in Laredo, testified for the defendants. His testimony included, however, that Red bought drugs legally in Mexico because drugs that would require a prescription in the United States could be obtained without one in Mexico and drugs were cheaper there. Shull verified that the shipment Red purchased from

8

Mexico was wrapped and sealed south of the border and that he, Shull, did not repackage it after it came across.

The government also presented testimony from Guy Stivender, a federal inmate at Forsyth County jail. At the beginning of Stivender's testimony, the court limited the jury's consideration of his statements to defendant Don Watson, only. Stivender testified that while in jail, Don said that he was involved in bringing in marijuana and Valium from Mexico through Texas and offered to front Stivender drugs to sell when Stivender was released.

A.

At the close of the government's case, and again at the close of all the evidence, the defendants moved to dismiss or acquit, arguing either that insufficient evidence showed their knowing assent to the conspiracy, or that the government had failed to prove a single conspiracy. The court denied these motions. On appeal, the defendants claim the evidence does not support the verdict.

Red Watson asserts separately that the district court erred in denying his Fed. R. Crim. P. Rule 29(c) motion. Red argues that the evidence adduced by the government shows only that he was associated with the other defendants and can't be stretched to demonstrate knowledge of the conspiracy or agreement to participate in it without engaging in a chain of inferences that is impermissibly long.

With respect to defining a conspiracy, the jury was instructed as follows:

> What the evidence in the case must show, beyond a reasonable doubt, in order to establish proof that a conspiracy existed, is that the members in some way or manner or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish the common and unlawful plan. The evidence in the case need not establish that all means and methods, which were agreed upon, were actually used or put in to operation.

9

Further, it is not necessary that all of the persons charged as members of the alleged conspiracy were, in fact, members. What the evidence in the case must establish beyond a reasonable doubt is that the alleged conspiracy was knowingly formed, and that two or more persons, including the accused, or the person you are then considering, were knowingly members of the conspiracy as charged in the indictment.

Further, to find the defendant guilty, you must unanimously find that he was a member of the conspiracy charged in the indictment, and not some other separate conspiracy. Now, one may become a member of the conspiracy without full knowledge of all of the details of the conspiracy or the identification of all of the co-conspirators.

On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of a conspiracy, does not thereby become a co-conspirator. You may not infer that a defendant is guilty of participating in the conspiracy merely from the fact that he was present while an overt act was committed, and had knowledge that it was being committed. And you may not find that a defendant participated in a conspiracy merely from the fact that he associated with other people who were guilty of the wrongdoing. Presence, knowledge, and association are circumstances which may be considered, however, in connection with the other evidence.

The court's instructions to the jury were not objected to. The testimony of the witnesses we have recited above, which was not nearly all the evidence in the case, indicates beyond a reasonable doubt that the jury was justified in finding all the defendants guilty as charged in the indictment. Even if a conspiracy might have been found from the evidence other than the one charged in the indictment, the evidence is ample to support the conspiracy charged. And we again note that the jury was charged that they had to find as to a defendant that "he was a member of the conspiracy charged in the indictment, and not some other separate conspiracy."

10

We are of opinion the government sustained its burden of proof under Glasser v. United States, 315 U.S. 60 (1942), both as to each of the defendants and as to Red Watson separately.

B.

Wesley Watson contends that the district court erred in admitting testimony concerning hearsay statements made by Wesley and relayed to Dennis Gale and Andy Holcomb through Brian. His argument concerning statements testified to by Gale, however, rests on the premise that Wesley and Brian were not coconspirators, which we reject and which cannot be supported in the face of overwhelming evidence that Wesley and Brian worked hand in hand in the operation of this drug ring.

With regard to Holcomb's testimony, we need provide no relief. Wesley also complains Holcomb was allowed to testify that Brian told him the purpose of Wesley's trip to Atlanta was to buy marijuana. The district court, however, sustained Wesley's attorney's objection and struck the statement.

C.

Don Watson contends the district court erred in refusing to allow one Drew Stein to testify that Wendell Neal, who was available as a witness, told him that he [Neal] was not worried about having been arrested on drug charges because "he had fixed that up by delivering a package." Don argues the statement shows that Neal planted the 100,000+ Valium pills found at Bill Hall's trailer and is admissible as a statement of Neal's then existing mental or emotional condition under Fed. R. Evid. 803(3).

The proposed testimony was hearsay and was properly excluded by the district court.

D.

Objection is made to admitting the testimony of one Hanes. Hanes, who had been a dope dealer with Crotts and knew about Crotts' get-

11

ting marijuana concealed in pottery, testified that Don Watson had told him (Hanes) that Don knew about Hanes and Crotts. The inference the government sought to draw was that the conversation referred to their dealing in marijuana. This conversation was stricken by the district court but made the subject of cross-examination by Don's attorney. At that point, the district court limited the effect of the conversation to Don, thereby excluding any of its effect on the other defendants. We perceive no error in its ruling.

E.

Wesley Watson claims that a civil forfeiture proceeding growing out of the seizure from him of some $55,000 in cash is a bar to his criminal prosecution under the Fifth Amendment's double jeopardy provision. The government has relied on various procedural bars to the assertion of that claim by Wesley. We need not consider them, however, for while this appeal was pending, the Supreme Court decided United States v. Ursery, 64 U.S.L.W. 4565 (U.S. June 24, 1996) (No. 95-345), which decided this defense was without merit, and we so hold.

F.

Don Watson asserts the district court erred at sentencing by including, in the drugs attributed to him, a 100 pound marijuana shipment received by Wesley Watson. The district court attributed the full amount to Don, finding that Don was "a member of the conspiracy to the extent greater than just a seller at times. The events that took place at his place, he took part, and was present for other things that were going on in connection with the conspiracy."

Don asserts, correctly, that in this circuit a defendant is not responsible for the acts of a coconspirator in jointly undertaken criminal activity unless the acts were "within the scope of the defendant's agreement and . . . reasonably foreseeable to the defendant." United States v. Gilliam, 987 F.2d 1009 (4th Cir. 1983). What constitutes the scope of the defendant's agreement is "a question of fact which will only be overturned on appeal if it is clearly erroneous." United States v. Vinson, 886 F.2d 740, 742 (4th Cir. 1989), cert. denied, 493 U.S. 1062 (1990). Consistent with the decision of the district court, the evi-

12

dence shows that Don and his automotive shop were quite involved with the conspirators' major drug purchases and operations. For example, cash for the purchases was collected there, and counted or secreted at Don's direction. Don was aware of the quantity of drugs received, and he exercised authority to control the disposition of large quantities of drugs without obtaining Wesley's permission. We conclude that the district court was not clearly erroneous in attributing the 100 pound marijuana shipment to Don.

G.

The defendants claim the district court erred in fixing their base offense level for sentencing purposes because it based its finding "primarily on the testimony of three government witnesses, Dennis Gale, Wendell Neal and Deborah Davis."

The defendants' claim is that these three witnesses had been impeached during the course of the trial, and the defendants conclude their testimony was, therefore, not reliable.

The district court, however, saw the witnesses and heard them testify, it was entitled to accept this testimony.

The judgments of conviction and sentence are accordingly

AFFIRMED.*

_____

*Hall argued at trial that there was no evidence to connect him with the drug ring's handling and distribution of marijuana, only of Valium. On appeal, he may be said to make the same claim as a fatal variance. The district court, however, submitted the case to the jury as that of one conspiracy under instructions which we have quoted and which were not objected to. The verdict forms to which no objection has been brought to our attention only provided for a general verdict as to each defendant of guilty or not guilty and were not parsed into counts and did not mention different or various crimes. No jury instruction was offered at trial which has been brought to our attention which sought to distinguish a marijuana from a Valium conspiracy. Under these circumstances, even if Hall was connected to the drug ring only through Valium and not through marijuana, we think that does not amount to a fatal variance.